FLAGG ENERGY DEVELOPMENT CORPORATION ET AL. *v.* GENERAL MOTORS CORPORATION, ALLISON GAS TURBINE DIVISION
(SC 15611)

Callahan, C. J., and Berdon, Norcott, Katz and Peters, Js.

Argued December 9, 1997—officially released March 17, 1998

*George D. Wenick*, pro hac vice, with whom were *Brendan T. Flynn* and, on the brief, *Peter M. Crofton*, pro hac vice, and *David J. Heinlein*, for the appellants (plaintiff CCF-1, Inc., et al.).

*Marjorie Press Lindblom*, pro hac vice, with whom were *James H. Gale*, pro hac vice, and, on the brief, *Mark R. Kravitz* and *Bonnie L. Patten*, for the appellee (defendant).

*Opinion*

PETERS, J. General Statutes § 42a-2-725,[1] the statute of limitations contained in article 2 of the Uniform Commercial Code, establishes a four year time frame within which a buyer may bring a damages action for the sale of allegedly defective goods. Section 42a-2-725 (2) further specifies that a cause of action for breach of warranty accrues upon tender of delivery of the contract goods. The principal issue in this case is the applicability of § 42a-2-725 to a contract for the sale of goods in which the seller agrees not only to deliver the goods but also to perform testing of the goods at the buyer's work site.

The plaintiffs, Flagg Energy Development Corporation (Flagg), CCF-1, Inc. (CCF-1), and Process Construction Services, Inc. (Process),[2] brought an action claiming that the defendant, General Motors Corporation, Allison Gas Turbine Division,[3] had delivered defective gas turbine engines for a construction project.

---

[1] General Statutes § 42a-2-725 provides in relevant part: "Statute of limitations in contracts for sale. (1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

"(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered. . . ."

[2] Only CCF-1 and Process are parties to the present appeal. CCF-1 is a wholly owned single purpose subsidiary of Flagg. Flagg withdrew its appeal to this court. Despite the trial court's ruling, Process has participated in this appeal. The defendant has objected only with respect to issues arising out of the repair and replacement clause in the purchase agreement, which we discuss in part III of this opinion. For convenience, and because we can perceive no harm to the defendant in doing so, we will refer to the plaintiffs as including CCF-1 and Process, unless the context requires otherwise.

[3] Throughout this litigation, the underlying claim for damages has been directed at General Motors Corporation, either indirectly, through its Allison Gas Turbine Division, or directly, after its 1993 sale of that division. Because the parties have generally referred, without distinction, to General Motors

Because of losses allegedly suffered by the plaintiffs due to the failure of the engines to operate efficiently and economically, the plaintiffs claimed a right to recover compensatory and punitive damages, fees and costs. The defendant's answer raised, as a special defense, the claim that the warranty counts of the plaintiffs' complaint, filed October 26, 1992, were time barred by the provisions of § 42a-2-725.

Although the major focus of the plaintiffs' complaint was on the defendant's alleged breaches of the express and implied warranties contained in their 1987 purchase agreement, the complaint also included a count for breach of contract and two counts charging Allison with misrepresentation and breach of the Connecticut Unfair Trade Practices Act (CUTPA). General Statutes § 42-110 (b).[4] The trial court, *Dorsey, J.*, granted the defendant's motion to strike the latter two counts of the complaint.

The defendant filed a motion for summary judgment on the warranty counts, which the trial court, *Gaffney, J.*, granted in part. The court concluded that Flagg and Process were not proper parties to this action and that CCF-1's breach of warranty claims were time barred except for the allegation of breach of a promise for repair or replacement of defective material and equipment.

In motions to open and vacate the summary judgment, and to reargue, CCF-1 raised no question either about the accuracy of the facts described in the trial court's memorandum of decision or about the suitability

Corporation and its Allison Gas Turbine Division, we will characterize both as the defendant, unless the context requires the contrary.

[4] General Statutes § 42-110b provides in relevant part: "Unfair trade practices prohibited. Legislative intent. (a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ."

of the case for summary disposition.[5] Focusing only on the court's ruling on the statute of limitations, CCF-1 claimed, for the first time, that a 1990 settlement agreement between the parties contained new promises that, as a matter of law, constituted a novation and thereby renewed the accrual of the statute of limitations. The court concluded that the text of the settlement agreement did not support the plaintiffs' claim and, on that basis, denied CCF-1's motion on its merits.[6]

CCF-1 then presented to a jury its damages claim pursuant to the repair or replacement clause in the purchase agreement. At the end of CCF-1's presentation, the trial court, *Gaffney, J.*, directed a verdict in favor of the defendant on the ground of evidentiary insufficiency.

After the trial court's final judgment against them, the plaintiffs appealed to the Appellate Court.[7] We transferred their appeal to this court pursuant to Practice Book § 4024[8] and General Statutes § 51-199 (c).[9]

In their appeal, the plaintiffs challenge the adverse pretrial and trial rulings of Judge Dorsey and Judge Gaffney. They have raised four issues. First, they argue that the breach of warranty claims contained in their

---

[5] The record shows that, in their initial briefing on the motion for summary judgment, the parties had filed conflicting affidavits, representing differing views about the intent of the parties in entering into the purchase agreement for the engines.

[6] The court waived any procedural defects arising out of the plaintiffs' delay in raising this issue.

[7] The plaintiffs had filed appropriate notices to preserve their rights to appeal interim trial court rulings.

[8] Practice Book § 4024 provides in relevant part: "[Transfer of Cases]—— Motion for Transfer From Appellate Court to Supreme Court

"After the filing of an appeal in the appellate court, but in no event after the case has been assigned for hearing, any party may move for transfer to the supreme court. . . ."

[9] General Statutes § 51-199 (c) provides in relevant part: "The Supreme Court may transfer to itself a cause in the Appellate Court. . . ."

October, 1992 complaint were timely filed, within the four year § 42a-2-725 limitations period, because the purchasing agreement required the defendant to perform on-site testing that was not completed until November, 1988. Second, they contend that the 1990 settlement agreement was a novation that restarted the running of the limitations clock, either because it imposed new warranty obligations on the defendant, or because it supported the plaintiffs' independent claim for breach of contract. Third, they maintain that the repair or replacement clause contained in the 1987 purchase agreement affords them an additional remedy for breach of warranty that extends the period of limitations. Fourth, they claim a right to recover damages for misrepresentation and breach of CUTPA.[10] We are persuaded by none of these claims.[11]

I

THE 1987 PURCHASE AGREEMENT

We begin with an examination of the plaintiffs' claim that, under the terms of their purchase agreement, their breach of warranty claims were filed properly within the four year limitation period contained in § 42a-2-725. The plaintiffs do not dispute that § 42a-2-725 (2) provides for the accrual of a cause of action for breach of warranty, "regardless of the aggrieved party's lack of knowledge of the breach . . . when tender of delivery is made . . . ." They argue, however, that tender of delivery does not occur upon the physical delivery of the goods if, as in their case, a purchase agreement contains terms that postpone the tender of delivery. We disagree.

---

[10] We have recited these claims in the order in which we will address them, rather than in the order in which they are presented in the plaintiffs' brief.

[11] We address these claims on their merits despite the plaintiffs' repeated failure, at trial and in this court, to comply with the rules of practice. We do not condone such procedural defaults. It is no excuse that the plaintiff's lawyer appears in this case pro hac vice.

The record discloses the following facts. As the trial court observed, although the parties draw differing legal conclusions from the history of their contractual relationship, the underlying relevant facts and documents are not at issue.[12] On November 12, 1987, Sulzer Turbosystems, Inc. (Sulzer), and Process entered into a purchase agreement (1987 purchase agreement) for two gas turbine generator assemblies, including two engines manufactured by the defendant. Process needed the engines to power the generators required to fulfil its obligation to construct and operate a cogeneration power plant in Hartford. CCF-1 was the owner of the property on which the power plant was to be built. Soon after delivery of the engines, the plaintiffs voiced repeated complaints about their performance, and, on October 26, 1992, filed the present complaint.

The terms of the 1987 purchase agreement contained express and implied warranties as well as a clause requiring Sulzer, for a period of one year from the date of acceptance of the engines, to replace or to remedy defective materials or equipment.[13] The agreement also obligated Sulzer to provide staff, at the plaintiffs' construction site, to perform "check-out, start-up, [and] preliminary acceptance test[ing] . . . ."[14] Finally, the agreement provided that CCF-1 would pay for the goods "30 days after satisfactory completion of the Preliminary Acceptance Test, but not more than 60 days from date of delivery or 90 days from alternative due to [Sulzer] supply."

[12] In their brief opposing the defendant's motion for summary judgment, the plaintiffs claimed that the date of delivery of the engines was a matter of fact. They did not, however, identify in their brief any specific factual controversy about the dates when the critical events in this case had occurred. They relied instead on affidavits explaining their view as to the proper interpretation of the purchase agreement.

[13] We consider the effect of the repair or replacement clause in part III of this opinion.

[14] Accompanying technical specifications provided details about the contemplated tests.

Sulzer physically delivered the engines to the construction site on May 27 and June 23, 1988. Their installation was completed by July 26, 1988. The tests described in the purchase agreement, however, had not been performed by that time. The check-out and component tests were not completed until November 3, 1988, and the acceptance tests were not completed until November 11, 1988.

Thereafter, Process complained to Sulzer both about alleged delays in Sulzer's delivery of the engines and about alleged deficiencies in the engines' performance. On July 31, 1990, to resolve these problems, the parties entered into a settlement agreement (1990 settlement agreement), pursuant to which, inter alia, the defendant agreed to accept delegation of most of Sulzer's duties under the 1987 purchase agreement. The parties also agreed that U.S. Turbine Corporation, a repair center acting under the authority of the defendant, would perform all future maintenance and repair work on the engines in accordance with a specified operating cost program.

The plaintiffs maintain, on appeal, that the trial court improperly concluded that their October 26, 1992 complaint was untimely. The parties agree that § 42a-2-725 contains the applicable statute of limitations. They disagree about the proper construction of subdivision (2) of that statute, which provides that a breach of warranty occurs when tender of delivery is made, "except that where a warranty *explicitly* extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." (Emphasis added.)

The plaintiffs argue that, under article 2 of the Uniform Commercial Code, the testing obligations contained in the 1987 purchase agreement postponed the

date of accrual of their cause of action, from the date of the physical delivery of the second engine in June, 1988, until the date of completion of the contemplated testing in November, 1988. Alternatively, they maintain that the Uniform Commercial Code permits contractual variation of the limitations provisions of § 42a-2-725, and that their contract manifests the requisite agreement.

The trial court rejected both arguments. Construing the Uniform Commercial Code, the court held that, presumptively, a breach of warranty occurs at the time of tender of delivery of the goods themselves without regard to subsequent inspection, testing or acceptance of the goods. This presumptive rule recognizes the commercial utility of establishing a definite time period to define the duration of a seller's liability for breach of warranty. See, e.g., *Cincinnati* v. *Dorr-Oliver, Inc.*, 659 F. Sup. 259, 264 (D. Conn. 1986); 1 J. White & R. Summers, Uniform Commercial Code (3d Ed. 1988) § 11-9, p. 604. Construing the 1987 purchase agreement, the court held that its terms, as a matter of law, did not manifest *explicitly* the parties' intention to modify the accrual of the statute of limitations. The court noted that, insofar as the plaintiffs' interpretation of the 1987 purchase agreement suggested a contractual equivalence between delivery of the goods and final acceptance, that reading was inconsistent with the distinction in the agreement's payment clause between delivery and acceptance. It also observed that, because the agreement contained no time frame within which the on-site testing was to be performed, the plaintiffs' view of the agreement might create a situation in which, despite delivery, installation and use of the engines, accrual of the statute of limitations might be postponed indefinitely.

The plaintiffs renew both claims on appeal to this court. Relying on General Statutes § 42a-2-503,[15] the plaintiffs argue that the Uniform Commercial Code defines "tender of delivery" not by reference to physical delivery, but by compliance with the terms of contractually prescribed obligations, including, in their case, the defendant's obligation with respect to on-site testing. Relying on the 1987 purchase agreement as a contractual modification, they claim that the on-site testing provisions manifest an intent to postpone "tender of delivery." For these reasons, they contend that the defendant's November, 1988 completion of on-site testing made their breach of warranty claims timely. We are not persuaded.

A

For statutory authority on the meaning of "tender of delivery" in article 2 of the Uniform Commercial Code, the plaintiffs cite the text of § 42a-2-503 and the official comment 1 to that section.[16] We are not persuaded that

[15] General Statutes § 42a-2-503 provides in relevant part: "Manner of seller's tender of delivery. (1) Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery. The manner, time and place for tender are determined by the agreement and this article, and in particular (a) tender must be at a reasonable hour, and if it is of goods they must be kept available for the period reasonably necessary to enable the buyer to take possession; but (b) unless otherwise agreed the buyer must furnish facilities reasonably suited to the receipt of the goods. . . ."

[16] General Statutes § 42a-2-503 (1) provides in relevant part: "The manner, time and place for tender are determined by the agreement and this article . . . ." Comment 1 to this section states in relevant part: "The term 'tender' is used in this article in two different senses. In one sense it refers to 'due tender' which contemplates an offer coupled with a present ability to fulfill all the conditions resting on the tendering party and must be followed by actual performance if the other party shows himself ready to proceed. Unless the context unmistakably indicates otherwise this is the meaning of 'tender' in this article and the occasional addition of the word 'due' is only for clarity and emphasis. At other times it is used to refer to an offer of goods or documents under a contract *as if* in fulfillment of its conditions even though there is a defect when measured against the contract obligation. Used in

either the section or the official comment supports the position they espouse.

It is indisputable that § 42a-2-503 (1) states that "[t]he . . . time . . . for tender [is] determined by the agreement and this article . . . ." Textually, that language does not address what constitutes a "tender of delivery." Nowhere else does the statutory text of article 2 of the Uniform Commercial Code contain an express definition of the phrase.

The closer statutory rule may be found in the definitions of "tender of delivery" contained in the official comment 1 to § 42a-2-503. The language of the comment does not support the plaintiffs' position. One definition describes "tender" as "an offer coupled with a present ability to fulfill all the [contractual] conditions . . . [which] must be *followed* by actual performance . . . ." (Emphasis added.) A.L.I., Uniform Commercial Code (14th Ed. 1995) § 2-503, official comment 1. The other definition describes "tender" as "an offer of goods . . . under a contract *as if* in fulfillment of [contractual] conditions . . . ." (Emphasis added.) Id. The meaning of this "as if" proposition is clarified in the immediately succeeding sentence, which defines "tender," in all cases, as "such performance by the tendering party as puts the other party in default if he fails to proceed in some manner." Id. Under the Uniform Commercial Code, the defendant's physical delivery of the engines required the plaintiffs, on pain of default; General Statutes § 42a-2-703;[17] to take some action, either by

---

either sense, however, 'tender' connotes such performance by the tendering party as puts the other party in default if he fails to proceed in some manner." (Emphasis added.) A.L.I., Uniform Commercial Code (14th Ed. 1995) § 2-503, official comment 1.

[17] General Statutes § 42a-2-703 provides: "Seller's remedies in general. Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract as provided in section 42a-2-612, then

rejecting their tender; General Statutes § 42a-2-602;[18] or by paying the contract price to the defendant upon their acceptance. General Statutes § 42a-2-607.[19] General Statutes § 42a-2-606 (1)[20] expressly ties "a reasonable opportunity to inspect the goods" to "acceptance" rather than to "tender of delivery." Accordingly, the relevant statutory provisions in article 2 of the Uniform Commercial Code do not, by themselves, make performance of the defendant's on-site testing obligations a condition of a tender of delivery.

Our conclusion that there is a statutory distinction between preacceptance testing and tender of delivery

also with respect to the whole undelivered balance, the aggrieved seller may (a) withhold delivery of such goods; (b) stop delivery by any bailee as provided in section 42a-2-705; (c) proceed under the next section respecting goods still unidentified to the contract; (d) resell and recover damages as hereafter provided in section 42a-2-706; (e) recover damages for nonacceptance as provided in section 42a-2-708 or in a proper case the price as provided in section 42a-2-709; (f) cancel."

[18] General Statutes § 42a-2-602 provides in relevant part: "Manner and effect of rightful rejection. (1) Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller. . . ."

[19] General Statutes § 42a-2-607 provides in relevant part: "Effect of acceptance; notice of breach; burden of establishing breach after acceptance; notice of claim or litigation to person answerable over. (1) The buyer must pay at the contract rate for any goods accepted.

"(2) Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this article for nonconformity. . . ."

[20] General Statutes § 42a-2-606 provides in relevant part: "What constitutes acceptance of goods. (1) Acceptance of goods occurs when the buyer (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or (b) fails to make an effective rejection as provided by subsection (1) of section 42a-2-602, but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or (c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him. . . ."

is supported by holdings of courts in other jurisdictions. Many courts have held that contractual provisions for postdelivery testing or inspection do not delay the accrual of breach of warranty claims. *Cincinnati* v. *Dorr-Oliver, Inc.*, supra, 659 F. Sup. 263–64; *Long Island Lighting Co.* v. *Transamerica Delaval, Inc.*, 646 F. Sup. 1442, 1455 (S.D.N.Y. 1986); *Ontario Hydro* v. *Zallea Systems, Inc.*, 569 F. Sup. 1261, 1265–68 (D. Del. 1983); cf. *New York* v. *Pullman, Inc.*, 662 F.2d 910, 919 (2d Cir. 1981).

## B

The plaintiffs' stronger argument is that the 1987 purchase agreement was a permissible contractual variation of the otherwise applicable statutory rules. We agree with the plaintiffs that the Uniform Commercial Code confers broad authority on the contracting parties either to define statutory terms or otherwise to vary statutory provisions. General Statutes § 42a-1-102 (3).[21] General Statutes § 42a-1-102 counsels, however, that specific language in the text of any section of the Uniform Commercial Code may limit the scope of an otherwise permissible contractual variation. Section 42a-2-725 limits the authority of contracting parties in two respects. Subdivision (1) of the statute provides: "By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it." Subdivision (2) of the statute allows the parties to postpone the occurrence of a breach of warranty only

---

[21] General Statutes § 42a-1-102 provides in relevant part: "Purposes; rules of construction; variation by agreement. . . .

"(3) The effect of provisions of this title may be varied by agreement, except as otherwise provided in this title and except that the obligations of good faith, diligence, reasonableness and care prescribed by this title may not be disclaimed by agreement, but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.

"(4) The presence in certain provisions of this title of the words 'unless otherwise agreed' or words of similar import does not imply the effect of other provisions may not be varied by agreement under subsection (3). . . ."

if "a warranty *explicitly* extends to future performance of the goods . . . ." (Emphasis added.) We disagree with the conclusions that the plaintiffs draw from these statutory provisions.

The question before us is not whether the parties had the contractual power to modify the time when a breach of warranty occurs or to redefine tender of delivery, which presumptively starts the accrual of claims for breach of warranty. The issue, rather, is whether they exercised that power "explicitly," as § 42a-2-725 (2) requires.[22] We are not persuaded that they have done so.

If a statute requires an agreement "explicitly" to extend the accrual of warranty obligations, the unstated intent of the parties cannot be relied upon to add to, or to explain, the terms of the agreement. We disagree, therefore, with the plaintiffs' contention that the trial court improperly construed the 1987 purchase agreement as raising a question of law that could be resolved by summary judgment.[23] See 2 Restatement (Second), Contracts § 212 (2) (1981).[24]

We are unable to discern any language in the 1987 purchase agreement that *explicitly* extends the defendant's responsibility for breach of warranty. The agreement contains no express linkage between the defendant's contractual duty to provide staff for on-site testing and a modification of the statutory conditions

---

[22] In part III of this opinion, we consider the effect of the one year repair or replacement clause on the timeliness of the plaintiffs' claims.

[23] In light of our conclusion that § 42a-2-725 requires any contractual variation of its terms to be explicitly stated, we are not persuaded by evidence of the parties' contractual intent that the plaintiffs cited in their affidavits opposing the defendant's motion for summary judgment.

[24] Section 212 (2) of the Restatement (Second) of Contracts provides: "A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence. Otherwise a question of interpretation of an integrated agreement is to be determined as a question of law."

for tender of delivery or for accrual of claims for breach of warranty. That omission is notable because the payment clause of the agreement expressly distinguishes between delivery and acceptance.

It would be questionable policy to interpolate linkage provisions into an agreement that contains no time frame for the performance that the plaintiffs allege to be contractual prerequisites to a tender of delivery. *New England Power Co.* v. *Riley Stoker Corp.*, 20 Mass. App. 25, 29, 477 N.E.2d 1054 (1985) (rejecting similar theory because it "would extend the statute of limitations indefinitely into the future since a defect at the time of delivery would prevent proper due tender from taking place until it was corrected" [internal quotation marks omitted]). Under the plaintiffs' argument, the date for accrual of their warranty claims might be postponed indefinitely, even for reasons entirely unrelated to the defendant's performance.[25]

In light of the disapproval under the Uniform Commercial Code of contracts that have the effect of extending the statute of limitations; General Statutes § 42a-2-725 (1); we conclude that the 1987 purchase agreement did not meet the modification criterion specified by § 42a-2-725 (2). The 1987 purchase agreement, therefore, did not save the express and implied warranty counts[26] of the plaintiffs' complaint from the bar of the statute of limitations.

---

[25] In this case, the record contains a letter documenting just such a difficulty. On March 17, 1989, William F. Griffin, Jr., the president of Process, wrote to Sulzer that Process had expected on-site testing to begin "shortly after delivery." The reason why such testing was not completed until November 3, 1988, was "a failure of the steam turbine provided by Murray Turbomachinery, Inc. That failure occurred on August 4, 1988, at which time we were projecting the start of a seven day series of tests on August 8, 1988." Referring to the alleged failure of the defendant to deliver the gas turbines in timely fashion, Griffin concluded that the defendant had "delayed project completion from May 15, 1988, to August 15, 1988 . . . ."

[26] The plaintiffs have not claimed that, with respect to the running of the statute of limitations, we should distinguish between any of the express or implied warranty counts in their complaint.

## II

## THE 1990 SETTLEMENT AGREEMENT

We next consider the merits of the plaintiffs' claim that the 1990 settlement agreement made their breach of warranty claims timely. Their principal argument is that the 1990 settlement agreement was a novation, under which the defendant assumed newly actionable warranty obligations that accrued well within the four year limitations period of § 42a-2-725. Alternatively, they argue that, as a contract, the 1990 settlement agreement was actionable apart from the warranty claims in their complaint; General Statutes § 42a-2-701;[27] and, therefore, not subject to § 42a-2-725. We disagree.

## A

CCF-1 presented the novation issue to the trial court in a motion to open and vacate the summary judgment rendered in favor of the defendant.[28] In the motion,

The third count of their complaint, alleging breach of an implied warranty of fitness, expressly limits the scope of that warranty. That count alleges that the engines are not suitable "because they run less than 5,000 hours between major overhauls and because of the defects and deficiencies set forth in paragraphs 16 and 24 of this complaint." At the jury trial, the plaintiffs expressly disclaimed any reliance on a warranty of fitness, but focused instead on the alleged warranty against design defects. Although the trial was limited to the terms of the repair or replacement clause, the plaintiffs maintained at the time that this clause incorporated their other express and implied warranty claims. See part III of this opinion. The limited scope of the warranty of fitness distinguishes this case from *Latham & Associates, Inc.* v. *William Raveis Real Estate, Inc.*, 218 Conn. 297, 308, 589 A.2d 337 (1991) ("express warranty may be actionable despite provisions in contractual disclaimers and limitation of liability clauses . . . if . . . the restrictive clauses are factually determined to have been unreasonable or to have failed of their 'essential purpose' ").

[27] General Statutes § 42a-2-701 provides: "Remedies for breach of collateral contracts not impaired. Remedies for breach of any obligation or promise collateral or ancillary to a contract for sale are not impaired by the provisions of this article."

[28] CCF-1 also filed a motion to reargue, based on the same issue raised in the motion to open and vacate.

CCF-1 acknowledged that it was raising "a new question of law, which the Court has not previously addressed, and which the parties have not previously briefed or argued."[29]

In its trial court brief in support of the motion to open and vacate, CCF-1 asserted that the settlement agreement was a novation, as a matter of law, because it substituted the defendant for Sulzer as the party responsible for Sulzer's warranty obligations. CCF-1 argued that it could not have pursued warranty claims against the defendant directly[30] until, by the terms of the 1990 settlement agreement, the defendant agreed to assume Sulzer's warranty obligations. On this reasoning, CCF-1 claimed that the 1990 settlement agreement made the complaint timely.[31]

The trial court, *Gaffney, J.*, concluded[32] that the 1990 settlement agreement was not a novation and, therefore, denied the motion of CCF-1. It relied on two

---

[29] In the trial court's memorandum denying CCF-1's motion to set aside the verdict, the court stated: "The sole cause of action which remained in the case at trial was an alleged breach by [the defendant] of a repair or replace warranty."

[30] We express no view about the extent of the defendant's liability to the plaintiffs in the absence of the 1990 settlement agreement.

[31] The 1990 settlement agreement provides in relevant part: "All duties of [Sulzer] under the [1987 purchase agreement] relating to components which [the defendant] supplied shall be delegated to [the defendant], [the defendant] accepts the delegation and [Sulzer] shall be released from such duties."

With respect to warranties, the 1990 settlement agreement further provided: "[Sulzer] acknowledges continuing warranty responsibility for the components listed on Schedule I (and for the time periods specified) which were supplied under the [1987 purchase agreement], provided that prior to the specified warranty expiration date, [Process] notifies [Sulzer], in writing, that the specific replacement component has failed to operate pursuant to the contract specifications. Subject to the above described warranty obligations . . . [Sulzer] shall be released from all other duties under the [1987 purchase agreement]."

[32] The court could have denied the motion because of its untimeliness in raising new issues. The terms of the settlement agreement were known to the plaintiffs at the time when they filed their complaint. The court decided, however, to address the claim on its merits.

aspects of the agreement, the absence of the word "novation," and the preservation of Sulzer's warranty obligation at least in some respects. The court held that the agreement was a modification and not a novation because it did not purport to extinguish all the rights and obligations of the parties under the 1987 purchase agreement, as the law of novation requires.

The plaintiffs, on appeal, focus on the provision in the 1990 settlement agreement that "[a]ll duties of [Sulzer] under the [1987 purchase agreement] *relating to components which [the defendant] supplied* shall be delegated to [the defendant], [the defendant] accepts the delegation and [Sulzer] shall be released from such duties." (Emphasis added.) Contrary to their position at trial, they now maintain that the trial court: (1) had no authority to decide their claim of novation by way of summary judgment because the existence of a novation is always an issue of fact; and (2) misconstrued the 1990 settlement agreement by failing to recognize its validity as a partial novation.

The plaintiffs' first claim cannot be sustained. Even if we were inclined to overlook the inconsistency between their arguments to the trial court and to this court; Practice Book § 4061;[33] we could not consider their argument on its merits because we lack the record to do so. Practice Book § 4061. In light of the position taken in the motion to open and vacate, the plaintiffs never submitted any affidavit at trial that would support

[33] Practice Book § 4061 provides in relevant part: "Review by the Court; Errors Considered

"The court may reverse or modify the decision of the trial court if it determines that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record, or that the decision is otherwise erroneous in law.

"The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

a claim of a factual controversy about the meaning of the 1990 settlement agreement. Absent such an affidavit, summary judgment was procedurally appropriate. See Practice Book § 380.[34]

The plaintiffs' second claim of novation is equally unavailing. We agree with the trial court that the language of the 1990 settlement agreement did not, in itself, create new warranty obligations and did not supersede or extinguish the warranty obligations contained in the 1987 purchase agreement.[35] *Riverside Coal Co.* v. *American Coal Co.*, 107 Conn. 40, 47, 139 A. 276 (1927); *Bushnell Plaza Development Corp.* v. *Fazzano*, 38 Conn. Sup. 683, 688, 460 A.2d 1311 (1983). To the extent that the 1990 settlement agreement substituted the defendant's new warranties for most of Sulzer's warranties, the content of the new warranties can be found only in the 1987 purchase agreement. The logic of the trial court's position is not undermined even if, as the plaintiffs now allege, the 1990 settlement agreement constituted only a partial novation. Although the parties may agree to a partial novation, an essential element of any novation is the extinguishing of the original contract by substitution of a new one. *Mace* v. *Conde Nast Publications, Inc.*, 155 Conn. 680, 688, 237 A.2d 360 (1967); *Ruwet Sibley Equipment Corp.* v. *Stebbins*, 15 Conn. App. 21, 26, 542 A.2d 1171, cert. dismissed, 209 Conn. 806, 548 A.2d 437 (1988).

There is, however, an even more fundamental flaw in the plaintiffs' argument of novation. In their complaint, the plaintiffs did not claim a right to damages

[34] Practice Book § 380 provides that a party opposing a motion for summary judgment "shall file opposing affidavits and other available documentary evidence. . . ."

[35] Contrary to the plaintiffs' assertion in their reply brief, the trial court impliedly held that the 1990 settlement agreement did not extinguish the purchase agreement. If CCF-1 had wished the court to clarify its holding, CCF-1 could have filed a motion of articulation. Because it failed to do so, the plaintiffs cannot now be heard to complain of alleged inadequacies in the trial court's memorandum of decision.

for breach of warranty arising directly under the 1990 settlement agreement. Although they alluded to the 1990 settlement agreement in paragraph thirteen of the first count of the complaint, that paragraph characterizes the defendant as having accepted Sulzer's duties *under the 1987 purchase agreement.* Consistently with the terms of the complaint, in response to the defendant's motion for summary judgment on the plaintiffs' express and implied warranty claims, the plaintiffs relied on the terms of the 1987 purchase agreement and not on the terms of the 1990 settlement agreement. It is too late for the plaintiffs to amend their complaint.

As the defendant notes, if the plaintiffs' novation argument were to be sustained, their pleadings would create a dilemma for them. The warranty claims in the plaintiffs' complaint, which rely on the 1987 purchase agreement, would have become unenforceable if the 1987 warranty obligations had been extinguished and superseded by the 1990 settlement agreement.

We conclude that the 1990 settlement agreement modifies and incorporates, but does not extinguish, the terms of the 1987 purchase agreement. The trial court properly denied the motion of CCF-1 to open and vacate the summary judgment on the ground of novation.

B

In addition to the plaintiffs' argument that the 1990 settlement agreement was a novation with respect to their breach of warranty claims, the motion of CCF-1 to open and vacate the summary judgment referred to the defendant's contractual obligations under the 1990 settlement agreement and asserted that no cause of action could have accrued against the defendant until July 31, 1990. The plaintiffs now reiterate that claim by arguing that the trial court improperly found a statutory limitations bar to the contracts claim, as distinguished from the warranty claims, in their complaint.

Although the court originally granted summary judgment only with respect to the plaintiffs' warranty claims, it subsequently broadened its holding in a verbal ruling. The court held that there was too close a congruence between the plaintiffs' contract claims and their express and implied warranty claims to warrant a distinction in the applicability of the breach of warranty statute of limitations in § 42a-2-725.

The plaintiffs' argument that they should be permitted to pursue an independent claim for breach of contract founders on two grounds. First, count one of the plaintiffs' complaint, which states the only claim for breach of contract, does not rely on the 1990 settlement agreement as having imposed freestanding contracts liability upon the defendant. Second, the plaintiffs have offered no reasoned argument challenging the trial court's construction of the first count of the complaint as essentially grounded in claims of breach of warranty. In the circumstances of this case, the plaintiffs' contract claim, like its warranty claims, is governed by § 42a-2-725.

We conclude, therefore, that the 1990 settlement agreement did not extend the accrual of the statute of limitations. We affirm the rulings of the trial court that the plaintiffs' warranty and contract claims were untimely.

### III

### THE REPAIR OR REPLACEMENT CLAUSE

We turn now to the merits of the plaintiffs' claim that a clause in the 1987 purchase agreement for repair or replacement of defective material or equipment was an additional warranty on which they could rely to postpone the accrual of the statute of limitations. In effect, they claim that the clause is an express warranty of future performance, so that "discovery of the breach

must await the time of such performance [and] the cause of action accrues when the breach is or should have been discovered. . . ." General Statutes § 42a-2-725 (2). We disagree.

The repair or replacement clause is to be found in the following provision of the 1987 purchase agreement: "All material and equipment furnished under this order shall be guaranteed by the Seller against defects, and Seller agrees to replace without charge to Purchaser said material and equipment, or remedy any defects latent or patent not due to ordinary wear and tear or due to improper use or maintenance, which may develop within one year from date of acceptance by the Owner, or within the guarantee period set forth in applicable plans and specifications, whichever is longer." The controversy between the parties concerns only the proper interpretation of the language beginning "and Seller agrees . . . ."

The construction of the repair or replacement clause became an issue at trial as a result of the defendant's motion for summary judgment with respect to all of the plaintiffs' warranty claims. The defendant argued that the clause was not an express warranty that postponed the running of the statute of limitations on the plaintiffs' warranty claims. The trial court agreed with the plaintiffs that the defendant's affirmative obligation to "remedy any defects" was an independent express warranty that extended to future performance. The court also held that the meaning and effect of the clause raised issues of fact that should not be resolved by a summary judgment.

The court then conducted a jury trial to determine CCF-1's rights under the repair or replacement clause. CCF-1 attempted to prove breach of this clause by introducing evidence allegedly showing breach of express and implied warranties contained elsewhere in the 1987

purchase agreement.[36] The trial court refused to admit such evidence on the ground that it was not probative of a failure to perform required repairs or replacements. Because of the absence of any other probative evidence of breach of the repair or replacement clause, the court granted the defendant's motion for a directed verdict.[37]

On appeal, the plaintiffs make the following claims. They argue that the trial court: (1) as a matter of law, improperly limited the scope of the repair or replacement clause by refusing to recognize its incorporation of other warranty obligations; and (2) in abuse of the court's discretion, improperly failed to permit the plaintiffs to demonstrate breach of the repair or replacement clause by evidence that the engines delivered by the defendant suffered from design and other defects that made them unreasonably costly to maintain.

Before we reach these claims, however, we must consider an antecedent question concerning the relationship between the repair or replacement clause and the provisions of § 42a-2-725. Without establishing such a relationship, the plaintiffs cannot prevail on their warranty claims. The ultimate issue raised by the defendant's motion for summary judgment must be decided by determining the date of accrual of the plaintiffs'

---

[36] In its memorandum of decision denying CCF-1's motion to set aside the verdict, the trial court described the procedural history of this dispute as follows. In accordance with the ruling on its motion for summary judgment, CCF-1 was required to file a revised complaint. The defendant properly objected to two revised complaints that contained language reasserting the defendant's alleged breach of warranties of fitness and merchantability.

The court stated: "Counsel for [CCF-1] conceded, as reflected in the fourth revision [of the complaint], that although he had semantically modified his client's claims, the changes would not alter his intended presentation of evidence . . . ." In a further dialogue with the court, counsel conceded that he would expect to present " 'that same kind of evidence' " under the fourth complaint.

[37] In effect, by granting the defendant's motion for a directed verdict, the trial court granted the defendant's motion for summary judgment in its entirety.

warranty claims for defective *performance* of the engines themselves.[38]

The defendant argues, and we agree, that the repair or replacement clause contains no terms that, as a matter of law, would constitute an explicit warranty of future performance, as § 42a-2-725 (2) requires. In the event of defects in the engines, the clause describes no more than a contractual commitment by the defendant, for a limited period of time, to provide remedies additional to those provided by article 2 of the Uniform Commercial Code. It is irrelevant that the plaintiffs have attached a warranty label to the clause. "Putting a [warranty] tag on a [nonwarranty clause] will no more change its essential character than calling a bull a cow will change its gender." *State* v. *Gooch*, 186 Conn. 17, 18, 438 A.2d 867 (1982). In light of its plain language, we conclude that the clause cannot be construed either as a new warranty of performance or as an additional commitment for future performance of other implied or express remedies.

Although this question is one of first impression for this court, decisions in other jurisdictions support our construction of the repair or replacement clause. State courts around the country have concluded that such clauses provide a buyer no relief other than that expressly promised by the language of the clause. Consequently, they too have held that a promise to repair or replace, unless it contains express language to the contrary, is not a promise of future performance with respect to § 42a-2-725 (2). See, e.g., *Tittle* v. *Steel City Oldsmobile GMC Truck, Inc.*, 544 So. 2d 883, 886–91 (Ala. 1989); *Voth* v. *Chrysler Motor Corp.*, 218 Kan. 644, 648–52, 545 P.2d 371 (1976); *Herbstman* v. *Eastman Kodak Co.*, 68 N.J. 1, 11–12, 342 A.2d 181 (1975).[39]

---

[38] The plaintiffs have not claimed that the defendant improperly failed to provide required repairs or replacements.

[39] For other decisions to a similar effect, see, e.g., *Boyd* v. *A.O. Smith Harvestore Products, Inc.*, 776 P.2d 1125 (Colo. App. 1989); *Poppenheimer*

Accordingly, we reject the plaintiffs' contention that the repair or replacement clause in the purchase agreement tolls the running of the statute of limitations under § 42a-2-725. Although we do so on a ground that differs somewhat from that upon which the trial court relied,[40] we affirm its judgment that all of the plaintiffs' warranty claims were filed too late. "This court is not required to reverse a ruling of the trial court which reached a correct result, albeit for a wrong reason." *Herrmann* v. *Summer Plaza Corp.*, 201 Conn. 263, 274, 513 A.2d 1211 (1986); *Favorite* v. *Miller*, 176 Conn. 310, 317, 407 A.2d 974 (1978).

## IV

### MISREPRESENTATION AND UNFAIR TRADE PRACTICES

The plaintiffs' final claim is that their complaint stated valid causes of action for misrepresentation and for breach of CUTPA. In the fourth count, the plaintiffs alleged that the defendant had knowingly or negligently misrepresented the future performance of the engines, and that the plaintiffs had relied on these misrepresentations to their detriment.[41] In the sixth count, the plaintiffs alleged that the defendant's misrepresentations had

v. *Bluff City Motor Homes*, 658 S.W.2d 106 (Tenn. App. 1983); *Muss* v. *Mercedes-Benz of North America, Inc.*, 734 S.W.2d 155 (Tex. App. 1987); see also *Carabello* v. *Crown Controls Corp.*, 659 F. Sup. 839 (D. Colo. 1987).

For an example of a differently worded clause that warranted a different construction, see, e.g., *Standard Alliance Industries, Inc.* v. *Black Clawson Co.*, 587 F.2d 813, 816–17 (6th Cir. 1978), cert. denied, 441 U.S. 923, 99 S. Ct. 2032, 60 L. Ed. 2d 396 (1979).

[40] The trial court, in explaining its evidentiary rulings at the jury trial, came very close to espousing our construction of the repair or replacement clause. It stated, for example, that "[w]hether it's a defect or not a defect, is not in this case. . . . If [there] is a defect . . . in the design or whatever, so be it. But its not the kind of defect that is encompassed by the warranty that is the subject of this lawsuit."

[41] Count four of the plaintiffs' complaint states the core of their claim of misrepresentation. Paragraph twenty-five reads as follows: "At the time [when the defendant] made express representations and warranties to the

wrongfully induced them to purchase the engines produced by the defendant, and that, in consequence, the plaintiffs were entitled to actual and punitive damages and to attorney's fees.[42]

The defendant filed a motion to strike these two counts "because the plaintiffs are seeking recovery for commercial loss and, as a result, are limited to the remedies provided by the Uniform Commercial Code." The plaintiffs argued, to the contrary, that actions for fraud did not fall within the economic loss rule. Further, they maintained that, even if the economic loss rule would otherwise have barred their tort and unfair practices claims, those claims were validated by savings provisions contained in the Uniform Commercial Code, General Statutes § 42a-1-103[43] and § 42a-2-721.[44] Finally, they argued that their allegations of fraudulent inducement stated a valid claim under CUTPA.

Plaintiffs regarding the future performance of the engines, the engines' readiness for commercial use, and [the defendant's] commitment to support the engines with service, spare parts and product development, all as set forth in paragraphs 8 and 9 of this complaint, [the defendant] knew or should have known that these representations and warranties were untrue or could or would not be met."

[42] The sixth count provides in relevant part: "30. [The defendant] induced [the] Plaintiffs to select the [defendant's] engines for use in the Project by making misrepresentations, including that the engines were ready for commercial use and fit for the intended purpose . . . .

"31. [The defendant] never intended to supply [the] Plaintiffs with engines that would satisfy the Project requirements, but induced [the] Plaintiffs to purchase [the defendant's] engines so that [the defendant] could use the Project as a laboratory for developing and improving those engines. . . ."

[43] General Statutes § 42a-1-103 provides: "Supplementary general principles of law applicable. Unless displaced by the particular provisions of this title, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

[44] General Statutes § 42a-2-721 provides: "Remedies for fraud. Remedies for material misrepresentation or fraud include all remedies available under this article for nonfraudulent breach. Neither rescission or a claim for rescission of the contract for sale nor rejection or return of the goods shall bar or be deemed inconsistent with a claim for damages or other remedy."

The trial court rejected the plaintiffs' arguments and granted the defendant's motion to strike. After painstaking examination of the applicable case law and statutory authorities, the court concluded that "a situation such as this one—involving commercial parties and economic losses suffered as a result of an alleged product failure—is precisely the type of circumstance where such misrepresentation and breach of contract [claims] are incompatible."

In their original brief on appeal, the plaintiffs did not contest the validity of the trial court's statutory analysis. Instead, they argued that the trial court improperly applied the economic loss rule because, in their view, the rule does not apply to claims "for negligent misrepresentation of information provided for the guidance of others or to claims for unfair trade practices."[45] We agree with the holdings of cases in other jurisdictions that commercial losses arising out of the defective performance of contracts for the sale of goods cannot be combined with negligent misrepresentation. See *Duquesne Light Co.* v. *Westinghouse Electric Corp.*, 66 F.3d 604, 618 (3d Cir. 1995); *Princess Cruises, Inc.* v. *General Electric Co.*, 950 F. Sup. 151, 155 (E.D. Va. 1996) ("The parties are sophisticated corporations familiar with the type of services rendered, and the consequences of a mechanical failure likely to result from a failure to perform the contract as promised. The parties were free to allocate the risks, insure against potential losses, and adjust the contract price as they

---

[45] We disagree with cases such as *John Martin Co.* v. *Morse/Diesel, Inc.*, 819 S.W.2d 428, 431 (Tenn. 1991), in which the Tennessee Supreme Court explained that "the theory of recovery is that the defendant negligently supplied information intended for the guidance of others; the plaintiff relied upon the misrepresentation in the performance of his contracted service and experienced business losses as a result." See *State by Bronster* v. *United States Steel Corp.*, 82 Haw. 32, 41–44, 919 P.2d 294 (1996); see also *Vermont Plastics, Inc.* v. *Brine, Inc.*, 824 F. Sup. 444, 451–52 (D. Vt. 1993), aff'd, 79 F.3d 272 (2d Cir. 1996).

deemed most wise. This Court sees 'no reason to extricate the parties from their bargain.' "); see also General Statutes § 52-572n (c);[46] 1 Restatement (Third), Torts, Products Liability (proposed final draft) § 6, p. 303 (1996).[47] These authorities are particularly persuasive in the circumstances of this case, in which the misrepresentation and CUTPA claims depend upon allegations of fact that are identical to those asserted in their claims.

In their reply brief, relying on §§ 42a-1-103 and 42a-2-721 of the Uniform Commercial Code, the plaintiffs renew the statutory arguments that the trial court found unpersuasive. We agree with the trial court's rejection of these statutory claims.

Section 42a-1-103 preserves a broad range of common-law actions, including actions for fraud and misrepresentation, unless such actions are "displaced by the particular provisions of this title." One such "particular provision" is § 42a-2-721. Section 42a-2-721 provides that, in some circumstances, a claim for a remedy for material misrepresentation or fraud may be consistent with other claims arising under article 2 of the Uniform Commercial Code. Such consistency may be found in the event of "rescission or a claim for rescission of the contract for sale [or] rejection or return

---

[46] General Statutes § 52-572n (c) provides: "As between commercial parties, commercial loss caused by a product is not harm and may not be recovered by a commercial claimant in a product liability claim. An action for commercial loss caused by a product may be brought only under, and shall be governed by, title 42a, the Uniform Commercial Code."

[47] The comment to § 6 of the proposed final draft of the Restatement (Third) of Torts provides: "[P]roducts liability law lies at the boundary between tort and contract. Some categories of loss, including those often referred to as 'pure economic loss,' are more appropriately assigned to contract law and the remedies set forth in Articles 2 and 2A of the Uniform Commercial Code. When the Code governs a claim, its provisions regarding such issues as statutes of limitation, privity, notice of claim, and disclaimer ordinarily govern the litigation." Restatement (Third), Torts, Products Liability (proposed final draft) § 6, p. 303 (1996). The proposed final draft was adopted, subject only to editorial revisions, at the May, 1997 annual meeting of the American Law Institute.

of the goods . . . ." General Statutes § 42a-2-721. The official comment to that section emphasizes that, even in such cases, the circumstances may make the remedies inconsistent.[48] A.L.I., Uniform Commercial Code, supra, § 2-721, official comment. By implication, the intent of § 42a-2-721 is to make actions for fraud or misrepresentation presumptively *inconsistent* with postacceptance claims for breach of warranty.

In this case, the plaintiffs' claims for fraud and for unfair trade practices cannot be squeezed into the narrow presumption of consistency contained in § 42a-2-721. Wisely, the plaintiffs never claimed that their complaint rests either on their rejection of the engines tendered to them by the defendant; see General Statutes §§ 42a-2-601 through 42a-2-606;[49] or on their rescission of the 1987 purchase agreement.[50] Moreover, the relevant circumstances, as disclosed in the plaintiffs' complaint, do not support their § 42a-2-721 claim. As earlier noted, the pleadings in the fourth and sixth counts of the complaint depend, for their factual underpinnings, exclusively on facts alleged elsewhere in the complaint. This record fails to demonstrate a statutory basis to sustain the consistency of the challenged counts with other counts of the complaint.

[48] The official comment to § 42a-2-721 states that "[t]his section . . . makes it clear that neither rescission of the contract for fraud nor rejection of the goods bars other remedies unless the circumstances of the case make the remedies incompatible." A.L.I., Uniform Commercial Code, supra, § 2-721, official comment.

[49] General Statutes § 42a-2-601 governs buyer's rights on improper delivery; § 42a-2-602 governs manner and effect of rightful rejection; § 42a-2-603 governs merchant buyer's duties as to rightfully rejected goods; § 42a-2-604 governs buyer's options as to salvage of rightfully rejected goods when seller gives no instructions; § 42a-2-605 governs waiver of buyer's objections by failure to particularize; and § 42a-2-606 governs what constitutes acceptance of goods.

[50] Article 2 of the Uniform Commercial Code contains no express definition of what constitutes a "rescission."

The trial court, *Dorsey, J.*, properly granted the defendant's motion to strike the fourth and sixth counts of the plaintiffs' complaint. The trial court, *Gaffney, J.*, correctly ruled that the plaintiffs' claims in other counts of their complaint were barred by the statute of limitations.

The judgment is affirmed.

In this opinion the other justices concurred.