ALIKI FOODS, LLC, Plaintiff,

v.

**OTTER VALLEY FOODS, INC., Defendant.**

No. 3:08cv626 (MRK).

United States District Court, D. Connecticut.

March 26, 2010.

Order Denying Motions to Vacate and Dismissing Case July 7, 2010.

Morris R. Borea, Robbie T. Gerrick, Rome McGuigan Sabanosh, Hartford, CT, for Plaintiff.

Mitchell R. Harris, Thomas O. Farrish, Day Pitney LLP, Hartford, CT, for Defendant.

**RULING AND ORDER**

MARK R. KRAVITZ, District Judge.

Pending before the Court is the Motion for Partial Summary Judgment [doc. # 67] of Defendant Otter Valley Foods, Inc. ("Otter Valley"), requesting summary judgment on Count Two of the Second Amended Complaint of Plaintiff Aliki Foods, LLC ("Aliki"). Otter Valley argues that Count Two, alleging negligence, is barred by the economic loss doctrine, as articulated by the Connecticut Supreme Court in *Flagg Energy Development Corporation v. General Motors Corporation* (*"Flagg Energy"*), 244 Conn. 126, 154–55, 709 A.2d 1075 (1998), meaning that Aliki is limited to its contractual remedies. *See generally* Def.'s Mem. in Supp. of Mot. for Partial Summ. J. [doc. # 67–1]. For the reasons explained below, the Court agrees, and therefore grants Otter Valley's motion for summary judgment as to Count Two of Aliki's Second Amended Complaint.

**I.**

The facts of this case are straightforward and mostly uncontested, with a few key exceptions. Plaintiff Aliki, a Connecticut LLC, is a frozen foods company; it sells frozen sandwiches, meal entrees, and pizzas, primarily to food wholesalers such as Sam's Club, Costco, and BJ's Wholesale Club ("BJ's"). Aliki, however, does not manufacturer what it sells. Instead, it contracts with other companies, including the Defendant, a Canadian company, to purchase and, where necessary, import the food. Sometime in September 2003, Aliki engaged with Otter Valley to manufacture two products, including Fettuccini Alfredo with Chicken and Broccoli (referred to by the parties as "FACB"). Although the parties drafted a contract, it was never signed and important parts of it were left blank. *See* Draft Agreement dated Sept. 30, 2003, Ex. C to the Pappas Aff. in Opp'n

to Def.'s Mot. [doc. # 87–6]. Nonetheless, the parties agree that they entered into an agreement whereby Otter Valley agreed to manufacture, package, and label two Aliki products (including the fettuccine alfredo), and that Otter Valley performed its obligations under the terms of the agreement for several years. *See* Second Am. Compl. [doc. # 30] ¶¶ 8, 12; Def.'s Answer [doc. # 35] ¶¶ 8, 12.

On or about September 25, 2007, Aliki ordered 880 cases of the product to be delivered to a BJ's distributor in Maryland, Burris Logistics ("Burris"), *see* Purchase Order, Ex. 2 to Def.'s 56(a)1 Statement [doc. # 68–3], and another 880 cases to be delivered to another BJ's distributor in Massachusetts, C & S Wholesalers ("C & S"); *see* Purchase Order, Ex. 3 to Def.'s 56(a)1 Statement [doc. # 68–4]. On or about October 3, 2007, an Otter Valley transport truck containing the shipment of the product en route to Burris was stopped at the U.S.-Canadian border by inspectors of the U.S. Department of Agriculture (USDA). At the stop, the USDA inspectors took a sample of the food and placed a "hold" on the product shipment. Thereafter, the truck proceeded to Burris (which Aliki alleges it should not have done), and the product was delivered to Burris that same day. It is undisputed that Otter Valley emailed Mike Pappas, the President of Aliki, to inform him of the USDA "hold" on October 3, 2007, but a primary dispute between the parties is when Mr. Pappas became aware of the hold; Aliki says he did not receive the email until several days later because Mr. Pappas was travelling.

On or about October 7, 2007, the USDA informed Otter Valley that a test returned a "presumptive positive" result for the bacteria *Listeria monocytogenes* ("Listeria"). It is not clear what Otter Valley did with this information, but it is undisputed that Burris informed Mr. Pappas the following day, October 8, of the preliminary Listeria test results, and that by this time some 75 cases of the product had already been distributed to BJ's store locations. Mr. Pappas then contacted the BJ's locations and had BJ's pull the product. On October 9, 2007, the USDA contacted Aliki and told it that the product should be recalled; both Aliki and the USDA issued press releases that day announcing the voluntary recall. *See* Press Releases, Exs. H & I to the Pappas Aff. in Opp'n to Def.'s Mot. [doc. # 87–6]. Around the same time, Aliki discovered that the Otter Valley delivery of fettuccine alfredo to C & S on October 4 was from the same production run as that which tested positive for Listeria. Aliki alleges, but Otter Valley denies, that it should have, but did not, inform Aliki of this fact earlier. Aliki's negligence claim is based upon this alleged failure to inform. *See* Second Am. Compl. [doc. # 30] ¶ 40(d).[1] After notifying the USDA, Aliki expanded the voluntary recall to states beyond Maryland.

Aliki also alleges that on or about October 9, Otter Valley's Director of Q & A, Colleen Jameson–Homme, contacted Mr. Pappas to tell him that Otter Valley had submitted the wrong form to the USDA,

---

1. Aliki's negligence claim, as pleaded in the Second Amended Complaint, also includes allegations that Otter Valley failed to properly label the product and that it was negligent in submitting the wrong applications to the USDA for approval. *See* Second Am. Compl. [doc. # 30] ¶¶ 40(a)-(c). In opposing Otter Valley's motion for summary judgment on its negligence count, however, Aliki has argued only that the allegations concerning Otter Valley's mishandling of the USDA "hold" state a valid tort claim. *See* Pl.'s Objection to Def.'s Mot. [doc. # 86] at 1 ("The relevant allegations for purposes of Aliki's objection are contained at Par. 40(d)....."). Accordingly, the Court considers only those allegations identified by Aliki as relevant to the motion in this opinion.

mistakenly identifying the food as "ready to eat" instead of "cook to eat," resulting in the USDA testing the food for Listeria. The USDA apparently does not test "cook to eat" food for Listeria, as it is killed in cooking. Aliki also alleges that Otter Valley submitted the packaging to the USDA without the USDA-required "cook thoroughly" printed on it; whether Otter Valley was responsible for the packaging is another primary dispute in this case. On or about October 31, virtually all of the product subject to the USDA recall was destroyed, and on November 19, 2007, the USDA closed its file on the case.

Aliki filed suit on April 25, 2008, for breach of contract and negligence against Otter Valley, alleging lost sales and profits, including the loss of future earnings due to the harm to its reputation. *See* Compl. [doc. # 1]. On June 30, 2008, Aliki filed an amended complaint, adding a claim of breach of implied warranty and allegations that BJ's and/or C & S discontinued sales of Aliki's fettuccine alfredo and two of its other product lines as a result of the recall. *See* Am. Compl. [doc. # 4] ¶¶ 33, 35. Thereafter, on September 10, 2008, Otter Valley filed a motion to dismiss Count Two of the Amended Complaint (the negligence claim) on the basis of the economic loss doctrine. *See* Def.'s Mot. to Dismiss [doc. # 21]. Aliki filed a Memorandum in Opposition to the Motion to Dismiss [doc. # 25], but it also filed a second amended complaint on October 30, 2008, which made a handful of changes. *See* Second Am. Compl. [doc. # 30]. Among other changes, the new complaint added factual allegations that, over time, the terms of the parties' agreement "evolved" such that, by August 2006, Aliki would periodically send Otter Valley a "blanket purchase order" specifying some large number of cases of product to be prepared over the subsequent few months, *see id.* ¶ 10, but that Otter Valley would

not actually deliver any product until it received further documentation from Aliki; *see id.* ¶ 11; *see also* Sample "Blanket Purchase Order" dated Dec. 2006, Ex. D to the Pappas Aff. in Opp'n to Def.'s Mot. [doc. # 87–6]. The Second Amended Complaint also changed the wording of Aliki's negligence claim against Otter Valley, removing all references to the existence of a contract. *See* Second Am. Compl. ¶ 40.

The Court held an on-the-record telephonic conference with the parties on November 4, 2008 to discuss the partial motion to dismiss. During the call, the Court explained that it believed it more appropriate to handle the issue of the economic loss doctrine in the context of a motion for summary judgment. Defendant Otter Valley conceded that if it was determined that there was no contract between the parties—an issue of fact—the doctrine would not apply, and Aliki would not be limited to purely contractual remedies. Following the phone conference, the Court issued an order denying Otter Valley's partial motion to dismiss, but without prejudice to renewal in the context of a summary judgment motion. *See* Order [doc. # 31]. Otter Valley's pending motion for partial summary judgment, filed December 1, 2009, is essentially a renewal of its earlier motion to dismiss.

## II.

The summary judgment standard is a familiar one. Granting summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Williams v. Utica Coll. of Syracuse Univ.,* 453 F.3d 112, 116 (2d Cir.2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.,* 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

As the moving party, Otter Valley bears the burden of demonstrating that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Aliki, as the nonmovant, is entitled to have all ambiguities resolved and all inferences drawn in its favor. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Holcomb v. Iona College,* 521 F.3d 130, 137 (2d Cir.2008). However, if Otter Valley carries its burden, Aliki "may not rely merely on allegations or denials" to survive summary judgment. Fed.R.Civ.P. 56(e)(2). Rather, to successfully defeat the motion for partial summary judgment, Aliki must "set out specific facts," supported by admissible evidence, that show "a genuine issue for trial." *Id.* As the Supreme Court has put it in oft-quoted language, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

### III.

■ "The economic loss doctrine is a judicially created doctrine which bars re-

covery in tort where the relationship between the parties is contractual and the only losses alleged are economic." *Smith Craft Real Estate Corp. v. Handex of Conn., Inc.,* No. CV030082188S, 2004 WL 1615896, at *3 (Conn.Super.Ct. June 25, 2004) (citation omitted); *see also Flagg Energy,* 244 Conn. at 154–55, 709 A.2d 1075 (applying the doctrine). While simply stated, the doctrine and relevant case law can be confusing. *See, e.g., Santoro, Inc. v. A.H. Harris & Sons, Inc.,* No. CV030828039S, 2004 WL 2397155, at *4 (Conn.Super.Ct. Sept. 23, 2004) ("With due respect to the parties, neither appears to have correctly understood or applied the Supreme Court's controlling opinion in *Flagg.*"); *Milltex Properties v. Johnson,* No. 565866, 2004 WL 615748, at *4 (Conn.Super.Ct. Mar. 15, 2004) ("The Superior Courts have been divided as to whether the doctrine truly has been adopted in Connecticut and if it has, when to apply the doctrine."); *Reynolds, Pearson & Co., LLC v. Miglietta,* No. CV000801247, 2001 WL 418574, at *4 (Conn.Super.Ct. Mar. 27, 2001) ("There is inconsistency in the decisions of Superior Court judges regarding the applicability of the economic loss doctrine in Connecticut."). For that reason, and for the sake of clarity, the Court finds it useful to discuss here a few of the doctrine's principles.

■ The doctrine arose principally in the context of product liability, "where the economic losses are essentially contractual in nature, and therefore the risk may be allocated by the parties." *Hydro Investors, Inc. v. Trafalgar Power, Inc.,* 227 F.3d 8, 18 (2d Cir.2000) (citation omitted). The Supreme Court, in adopting the economic loss doctrine for general maritime law, explained that:

Contract law ... is well suited to commercial controversies of the sort in-

volved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. In exchange, the purchaser pays less for the product. Since a commercial situation generally does not involve large disparities in bargaining power, we see no reason to intrude into the parties' allocation of the risk.

*East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 872–73, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (citations omitted). The economic loss doctrine, in essence, holds the aggrieved party to the bargain it struck in its contract by preventing it from bringing a tort action for what is really the breach of a contractual duty. This protects the parties' expectancy interests and encourages them to build cost considerations into their contracts in the first place. *See generally BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo.2004) (explaining the policy reasons for the doctrine); *see also Hartford Fire Ins. Co. v. Leninski*, No. CV970396097S, 2002 WL 31513608, at *3 (Conn.Super.Ct. Oct. 29, 2002) ("Allowing tort claims for what is essentially a breach of contract would cause tort law to swallow up the body of common law surrounding contracts, including the appropriate measure of damages.") *Princess Cruises, Inc. v. Gen. Elec. Co.*, 950 F.Supp. 151, 156 (E.D.Va.1996) ("[T]o permit a party to a broken contract to proceed in tort where only economic losses are alleged would eviscerate the most cherished virtue of contract law, the power of the parties to allocate the risks of their own transactions.").

■ Nonetheless, there are limits and exceptions to the economic loss doctrine. One is that the doctrine only applies in situations where the injured party alleges

purely economic losses relating to the goods themselves. Thus, the economic loss doctrine does not generally bar recovery in tort if the plaintiff alleges either personal injury or damage to property other than the goods for which the parties contracted. *See, e.g., Cornwall Bridge Pottery, Inc. v. Sheffield Pottery, Inc.*, No. 07CV1154, 2008 WL 906833, at *3 (D.Conn. Apr. 2, 2008). This differential treatment is based on the different purposes served by contract and tort law:

> The tort concern with safety is reduced when an injury is only to the product itself. When a person is injured, the cost of an injury and the loss of time or health may be an overwhelming misfortune, and one the person is not prepared to meet. In contrast, when a product injures itself, the commercial user stands to lose the value of the product, risks the displeasure of its customers who find that the product does not meet their needs.... Losses like these can be insured. Society need not presume that a customer needs special protection. The increased cost to the public that would result from holding a manufacturer liable in tort to injury to the product itself is not justified.

*East River*, 476 U.S. at 871–72, 106 S.Ct. 2295 (citations and quotation marks omitted); *see also Mountain West Helicopter, LLC v. Kaman Aerospace*, 310 F.Supp.2d 459, 465–66 (D.Conn.2004) ("[E]conomic losses resulting from a product failure are barred because they do not implicate the safety concerns of tort law.").

■ A second limitation of the doctrine is that it generally applies only to contracts for the sale of goods, the origin of which "lies *not* in the broad common law of torts or contracts, but in the narrower, express provisions of Article 2 of the Uniform Commercial Code, which establishes special rules governing the remedies avail-

able for breaches of commercial contracts for the sale of goods." *Santoro,* 2004 WL 2397155, at \*4; *see also Flagg Energy,* 244 Conn. at 154–55, 709 A.2d 1075 (explaining why a negligent misrepresentation claim is inconsistent with other claims arising under Article 2 of the UCC). Thus, the economic loss doctrine does not typically apply to tort claims arising out of a contract for services. *See, e.g., Smith Craft Real Estate Corp.,* 2004 WL 1615896, at \*4 ("There is no allegation that the plaintiff's alleged damages resulted from the sale of a defective product. Therefore, the plaintiff's tort claims for economic loss are legally sufficient.").

■ Of course, many contracts involve so-called "hybrid transactions," under which the seller supplies both goods and services. In that situation, whether the contract is governed by the UCC's provisions regarding the sale of goods— and thus subject to the economic loss doctrine—becomes a question of "whether the dominant factor or 'essence' of the transaction is the sale of the materials or the services." *Nora Beverages, Inc. v. Perrier Group of Am.,* 164 F.3d 736, 747 (2d Cir. 1998) (quoting *Incomm, Inc. v. Thermo-Spa, Inc.,* 41 Conn.Supp. 566, 570, 595 A.2d 954 (Conn.Super.Ct.1991)). In the absence of a dispute of material fact regarding the terms of the agreement, Connecticut law treats the "dominant factor" test as a question of law for the court to determine. *See, e.g., Incomm,* 41 Conn.Supp. at 570, 595 A.2d 954; *Myrtle Mills Assocs. v. Bethel Roofing, Inc.,* No. 29–87–34, 1993 WL 382305, at \*2 (Conn.Super.Ct. Sept. 14, 1993); *see also Cornwall Bridge Pottery,* 2008 WL 906833, at \*2; *Connie Beale, Inc. v. Plimpton,* No. FSTCV085008751S, 2010 WL 398903 (Conn.Super.Ct. Jan. 13, 2010) (determining, on a motion to strike, the "dominant factor" of a contract).

■ However, even when these requirements are met—and a plaintiff alleges purely economic losses related to a contract for the sale of goods—courts have, to varying degrees, carved out exceptions to the economic loss doctrine. One such exception is for intentional torts, such as fraud. *See, e.g., Dunleavey v. Paris Ceramics USA, Inc.,* No. CV020395709S, 2005 WL 1094424, at \*7 (Conn.Super.Ct. Apr. 30, 2005). This exception is premised on at least two justifications. First, the possibility of tort liability could serve as an additional deterrent to the commission of intentionally wrongful acts; and second, it could permit the aggrieved party to recover damages not contemplated when drafting the contract due to that party's reasonable expectation that the other party would not intentionally cause it injury.

That said, courts are careful to distinguish an intentional tort from an intentional breach of the contract. In the latter situation, the bargained-for contract remedies should sufficiently compensate the injured party. Moreover, "[a]lmost every breach of contract involves actions than can be conceived of as a negligent or intentional tort." *Princess Cruises,* 950 F.Supp. at 156. This task of looking beyond the labels and adjectives asserted by counsel to ascertain the gravamen of a claim is similar to what courts already do in related contexts. *See, e.g., Triangle Underwriters, Inc. v. Honeywell, Inc.,* 604 F.2d 737, 747 (2d Cir.1979) (rejecting the argument that the plaintiff had wrongfully pleaded a simple breach of contract claim as a fraud claim in order to take advantage of the latter's longer statute of limitations, and explaining that the case "does not involve an[ ] attempt to dress up a contract claim in a fraud suit of clothes .... [the plaintiff] clearly alleges fraud that was extraneous to the contract, rather than a fraudulent nonperformance of the contract itself"); Ruling and Order [doc. # 62],

*GJN Advisors, Inc. v. Woolrich, Inc.*, No. 3:09CV338(MRK) (D.Conn. Jan. 20, 2010) at 2–4 (holding that although the plaintiff had successfully pleaded a breach of contract claim, it had not adequately pleaded a violation of the Connecticut Unfair Trade Practices Act—which requires substantial aggravating circumstances attending the breach—because "when one puts [the plaintiff's] adjectives to the side, and assesses the facts alleged . . . . this is a case in which [the plaintiff] alleges [only] that [the defendant] committed an intentional breach of contract").

■ Another exception to the economic loss doctrine that some jurisdictions, including New York, recognize permits recovery under a tort theory if the duty breached arose "from a special relationship that requires the defendant to protect against the risk of harm to plaintiff." *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 289, 727 N.Y.S.2d 49, 750 N.E.2d 1097 (2001). "Professionals, common carriers and bailees, for example, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties. In these instances, it is policy, not the parties' contract, that gives rise to a duty of due care." *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 551–2, 583 N.Y.S.2d 957, 593 N.E.2d 1365 (1992) (citations omitted); *see also Trs. of Columbia Univ. v. Gwathmey Siegel & Assocs. Architects*, 192 A.D.2d 151, 601 N.Y.S.2d 116, 119 (1993) ("[S]eparate tort liability [ ] can arise independently of the contractual relationship between the parties where the nature of the performance called for is affected with a significant public interest and failure to perform the service carefully and competently can have catastrophic consequences.") (citation and quotation marks omitted). While well-developed in the New York courts, few Connecticut

courts, if any, have had occasion to consider this exception.

■ Finally, some Connecticut trial courts, hewing closely to the facts in *Flagg Energy*, have limited the economic loss doctrine to situations where both the plaintiff and the defendant are sophisticated commercial parties. *See, e.g., Santoro*, 2004 WL 2397155, at *4; *Milltex Props.*, 2004 WL 615748, at *2 ("[W]hen the parties are sophisticated corporations they are capable of negotiating contractual terms regarding the risk of loss."); *Morganti Nat., Inc. v. Greenwich Hosp. Ass'n*, No. X06CV990160125, 2001 WL 1249807, at *1 (Conn.Super.Ct. Sept. 27, 2001) (describing the use of the economic loss doctrine as "most compelling" when, *inter alia*, "the parties are sophisticated corporations").

With these principles in mind, the Court turns to the merits of Otter Valley's argument that Aliki's negligence claim is barred by the economic loss doctrine.

## IV.

■ In this case, there is no dispute that Aliki is alleging purely economic losses, *see* Pl.'s Local R. 56(a)2 Statement [doc. # 87–5] ¶¶ 6–7, and that it is not alleging any intentional wrongdoing on the part of Otter Valley. Prior to oral argument, there also seemed to be no genuine dispute that the parties were generally acting pursuant to a contractual relationship—albeit one whose exact terms were somewhat ambiguous. Nonetheless, Aliki has advanced three arguments for why the economic loss doctrine does not apply to bar its negligence claim. As explained below, each is unavailing.

First, Aliki argues that its negligence count is not barred because a jury could find for it even if it found that Otter Valley did not breach any contract between the parties. *See* Pl.'s Mem. in Supp. of Objec-

tion to Def.'s Mot. ("Pl.'s Mem. Opp'n") [doc. # 87–1] at 6–8. In particular, Aliki says that even if it cannot prove that the food was actually contaminated with Listeria, a jury could still find that Otter Valley was negligent in not informing the C & S Warehouse in Massachusetts of the presumptive positive test for the bacteria. *See id.* at 7–8. Second, Aliki argues that its allegations regarding the "negligent failure to inform" claim "go beyond a sale of goods transactions under the UCC," and thus do not trigger the economic loss doctrine. *Id.* at 9.

During oral argument on the motion, Aliki made a third argument, suggesting that summary judgment as to its negligence claim ought to be denied on account of the ambiguities surrounding the parties' contractual relationship. Relevant to this argument is Aliki's factual assertion that the product it ordered from Otter Valley remained the property of Defendant even after it was delivered to either Burris or C & S, up until it was physically pulled from the warehouse and shipped to BJ's. *See* Pappas Aff. [doc. # 87–6] ¶¶ 9, 11. As mentioned previously, the parties had drafted an agreement in 2003, but had never signed it. Counsel for Plaintiff suggested that a jury could conclude that a contract between the parties was not formed until Aliki performed its end of the bargain by pulling the product from the warehouse for delivery to the individual retail stores. In this case, the allegedly contaminated product was not pulled from the Burris warehouse until either the 7th or 8th of October, 2007; yet Aliki's negligence claim would have arisen when Otter Valley was informed of the USDA "hold" on October 3, 2007. Plaintiff's counsel argued that if a contract was not formed until after the negligence claim arose, the economic loss rule would not preclude Aliki's negligence claim. Following oral argument, the Court permitted the parties to file supplemental briefs to address this issue, *see* Order [doc. # 90], which they did. *See* Def.'s Supplemental Mem. in Supp. of Mot. for Partial Summ. J. [doc. # 97]; Pl.'s Supplemental Mem. in Opp'n to Mot. for Partial Summ. J. [doc. # 99].

Aliki is correct that the elements it would have to prove for a negligence claim are different from that of a breach of contract claim, and that the former could succeed even where the latter fails. But this is hardly a reason for concluding that the economic loss doctrine does not apply. If anything, this argument highlights the doctrine's necessity by illustrating one of the incentives for a party to attempt to circumvent its contractual obligations. Moreover, this is hardly a situation where Aliki failed to consider the possibility of non-conforming goods, as demonstrated by the agreement drafted by the parties in 2003. *See* Draft Agreement dated Sept. 30, 2003, Ex. C to the Pappas Aff. in Opp'n to the Mot. for Part. Summary J. [doc. # 87–6]. Although never signed and incomplete in many material respects, the draft contract shows what terms the parties were considering. For example, although left blank, Exhibit B to the draft contract is entitled "Quality and Control Specifications for [Aliki] Products." The draft agreement stated that Otter Valley would manufacture and package the products in accordance with these specifications, *see id.* ¶ 1, and that Otter Valley would give Aliki certain warranties regarding the product, *see id.* ¶ 5. It also contained a provision on indemnification, *see id.* ¶ 7, whereby Aliki would have indemnified Otter Valley for any claim caused by any product that met the specifications in the contract, as well as for "any claim which is caused by [Aliki's] mishandling of the Product," *id.* ¶ 7(b). There is no comparable indemnification provision in the draft contract concerning claims arising

out of Otter Valley's "mishandling" of the product. A jury will determine whether the parties ultimately intended to incorporate these or other provisions regarding who bore what risk into their contractual relationship, *see Presidential Capital Corp. v. Reale,* 231 Conn. 500, 507, 652 A.2d 489 (1994), but no matter what the jury finds, the Courts "see[s] no reason to intrude into the parties' allocation of the risk," *East River,* 476 U.S. at 873, 106 S.Ct. 2295.

■ Aliki's second argument—that its "negligent failure to inform" claim is not based on the sale of goods—relies on a mischaracterization of the "dominant purpose" test. Aliki seems to want to sever the service portion of the contract—the delivery of the product—and say it is not under Article 2 of the UCC. This it cannot do. If the "dominant purpose" of the contract as a whole was for the sale of goods, then the entire agreement is governed by Article 2. *See Incomm,* 41 Conn.Supp. at 570, 595 A.2d 954; *Myrtle Mills Assocs.,* 1993 WL 382305, at *2; *see also Cornwall Bridge Pottery,* 2008 WL 906833, at *2.

"Goods," under Connecticut law, are defined as "all things, including specially manufactured goods, which are movable at the time of identification to the contract for sale...." Conn. Gen.Stat. § 42a-2-105(1). While there are disputes of fact about some of the terms of the contract between these parties—in particular, which party was responsible for designing the product packaging and who assumed what risk with regards to product that failed FDA tests—even if the terms were as Aliki claims, this does not change the primary purpose of the agreement, which Aliki never disputes was for the sale of goods. Therefore, the Court can make this determination as a matter of law. *See Cambridge Plating Co., Inc. v. Napco, Inc.,* 991 F.2d 21, 24 (1st Cir.1993) ("[Appel-

lant] contends that the district court erred in ruling as a matter of law that the contract with [Appellee] was a sale of goods contract within the scope of the UCC. Although determining the type of contract at issue typically may be a jury function, we believe the facts here are sufficiently clear and undisputed that the district court was permitted to make its finding as a matter of law.") (citation omitted).

Even taking the facts in the light most favorable to Aliki's position, the inescapable conclusion is that the predominant or "essential" purpose of the contract was the sale of goods—the frozen food products that Otter Valley manufactures and that Aliki sells to retail establishments. The contractual terms on labeling, packaging, and delivering the product (assuming they exist) are all ancillary to the production and sale of the product itself. Therefore, the entire contract is governed by Article 2, Aliki's argument to the contrary notwithstanding. *See Fab–Tech, Inc. v. E I. du Pont de Nemours & Co.,* 311 Fed.Appx. 443, 445 (2d Cir.2009) ("While the agreements also contain provisions concerning exclusivity, marketing, delivery, and other arguably service-related matters, these matters are all incidental to the sale of DuPont's coating product."); *cf. Bonebrake v. Cox,* 499 F.2d 951, 960 (8th Cir.1974) (explaining the test for determining whether Article 2 covers hybrid contracts as "whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (*e.g.,* contract with artist for painting) or is a transaction of sale, with labor incidentally involved (*e.g.,* installation of a water heater in a bathroom).") (footnotes omitted).

■ The third argument for permitting Aliki's negligence claim to move forward—that a jury could find that there was no contract between these parties until Aliki

actually pulled the product from the warehouse—is without support in either law or fact. First, under Connecticut law:

Unless otherwise unambiguously indicated by the language or circumstances . . . an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship *or by the prompt or current shipment of conforming or nonconforming goods.*

Conn. Gen.Stat. § 42a–2–206(1). Here, the undisputed evidence is that Aliki ordered the product in question on September 27, 2007. *See* Purchase Order, Ex. 2 to Def.'s 56(a)1 Statement [doc. # 68–3]; Purchase Order, Ex. 3 to Def.'s 56(a)1 Statement [doc. # 68–4]. It is further undisputed that Otter Valley shipped the goods on or before October 3, 2007, *see* Second Am. Compl. [doc. # 30] ¶ 13, constituting an acceptance. Thus, at the latest, a contract was formed when Otter Valley shipped the product—which is before Aliki's negligence claim would have arisen. Aliki's argument that title to the goods not pass to it until several days later is of no consequence, since it does nothing to change the date on which the contract for the sale of goods was formed. *See* Conn. Gen.Stat. § 42a–2–401(1) (providing that the formation of a contract and the passage of title are distinct).

Additionally fatal to Aliki's argument is that its director, Michael Pappas, submitted an affidavit that explains, in significant detail, how the parties entered into a contractual relationship in September 2003; how that agreement evolved over time; and why he believes Otter Valley breached it. *See, e.g.,* Pappas Aff. in Opp'n to Def.'s Mot. [doc. # 87–6] ¶ ("Some time in September of 2003, Aliki entered into an agreement (the 'Agreement') with Otter Valley to manufacture, package and label certain products, including, but not limited

to . . . Aliki Fettuccine Alfredo with Chicken and Broccoli; the ('Product')."). Aliki has presented no evidence—either through Mr. Pappas or otherwise—that even suggests that there was no contract as of September 2003, much less enough evidence that could lead a reasonable jury to the same conclusion.

In sum, there is no genuine dispute of material fact that Otter Valley undertook the production and delivery of the allegedly contaminated fettuccine alfredo pursuant to an agreement with Aliki. The exact terms of that agreement and whether Otter Valley breached them will be matters for the jury to determine; but should the jury find Otter Valley liable, Aliki will be limited to the bargained-for contract remedies.

### V.

For the foregoing reasons, Defendant's Motion for Partial Summary Judgment [doc. # 67] is GRANTED, and the Defendant is granted summary judgment on Count Two of the Second Amended Complaint [doc. # 30]. Count One, alleging breach of contract, and Count Three, alleging breach of implied warranty, remain for trial.

IT IS SO ORDERED.

### *RULING AND ORDER*

On March 26, 2010, the Court granted Defendant Otter Valley Foods, Inc.'s ("Otter Valley") Motion for Summary Judgment on Count Two of Plaintiff Aliki Foods, LLC's ("Aliki") Second Amended Complaint. *See* Ruling and Order [doc. # 102]. The Court reviewed at length in that decision the facts of this case, and the Court refers readers to that decision for a more fulsome discussion of the substantive issues underlying this dispute. *See id.* at 1–5. Suffice it to say for present purposes that Aliki has sued Otter Valley for dam-

ages arising from two shipments of Fettuccini Alfredo with Chicken and Broccoli ("FACB")—from Otter Valley's factory in Canada to warehouses in Maryland and Massachusetts—that were tainted or possibly tainted with *Listeria monocytogenes* ("Listeria"). The Court's summary judgment decision left for trial the remaining two claims of Aliki's complaint—namely, claims of breach of contract and breach of implied warranty. *See id.;* Second Am. Compl. [doc. # 30].

Currently pending before the Court are several motions to dismiss and several motions to vacate this Court's prior orders. *See* Pl.'s Mot. to Vacate [doc. # 109]; Def.'s Mot. to Dismiss [doc. # 111]; Pl.'s Supplemental Mot. to Vacate [doc. # 112]; Def.'s Supplemental Mot. to Dismiss [doc. # 117]; Pl.'s Supplemental Mot. to Vacate [doc. # 118]; and Pl.'s Supplemental Mot. to Vacate [doc. # 125]. All of these motions relate to Aliki's failure to obey Court orders, produce documents, and preserve computers and hard-drives during the course of discovery. Because the Court finds as a fact that Aliki acted in bad faith in this case, the Court GRANTS Otter Valley's motions to dismiss [docs. ## 111, 117], DENIES Aliki's motions to vacate [docs. ## 112, 118, and 125], and dismisses this case with prejudice.

## I.

Otter Valley served interrogatories and requests for production on Aliki on September 19, 2008. *See* Def.'s First Set of Interrogs. & Reqs. for Prod, Ex. 4 to Def.'s Mot. for Sanctions [doc. # 64–6]. In its requests for production, Otter Valley asked Aliki to produce "[a]ny and all documents concerning [FACB], including but not limited to documents concerning the ... recall ... of the [FACB]." Otter Valley also requested Aliki to produce "[a]ny and all documents concerning the email"

that Aliki claimed not to have received from Otter Valley "including but not limited to any documents concerning your alleged non-receipt of that e-mail." Finally, Otter Valley sought "[a]ny and all document concerning your damage claims," including "documents concerning any sale or profit that you allege you lost as a consequence of an act or omission of Otter Valley's." *Id.*

Aliki first responded to the interrogatories and requests for production on December 2, 2008. *See* Pl.'s Resp. to First Set of Interrogs. & Reqs. for Prod., Ex. 5 to Def.'s Mot. for Sanctions [doc. # 64–7]. Aliki produced 199 pages of documents and promised that more would be forthcoming. The first set of responses, however, were not signed by anyone at Aliki—as required by Rule 33(b)(3) of the *Federal Rules of Civil Procedure*—and two weeks later, Aliki sought to replace the first set of responses with a materially-different set, saying the first had been a "draft." *See* E-mail dated Dec. 17, 2009, Ex. 6 to Def.'s Mot. for Sanctions [doc. # 64–8]; Pl.'s Substitute Resps., Ex. 7 to Def.'s Mot. for Sanctions [doc. # 64–9].

Thereafter, on January 22, 2009, Aliki's President, Michael G. Pappas, was deposed in a parallel lawsuit between these parties in Canada. Mr. Pappas testified that "[t]here's a giant swath of documents that are on the recall that Otter Valley caused in the U.S.," and that those documents were in the possession of Aliki or its attorneys. *See* Pappas Canadian Dep., Ex. 8 to Def.'s Mot. for Sanctions [doc. # 64–10], at 113:20–21, 116:6–8. As a consequence of Mr. Pappas' testimony, Otter Valley began questioning Aliki's counsel regarding when the additional documents would be produced; at this point, Aliki had produced just the initial 199 pages. Otter Valley says that in May 2009, Aliki's counsel invited Otter Valley's attorney to retrieve addi-

tional documents from the former's office, but then reneged on that offer when Otter Valley's counsel arrived in his office lobby. *See* Def.'s Mem. in Supp. of Mot. for Sanctions [doc. # 64–2] at 6 (citing Letter dated June 2, 2009, Ex. 10 to Def.'s Mot. for Sanctions [doc. # 64–12] ). Otter Valley also says that at a settlement conference with Magistrate Judge Garfinkel on May 5, 2009, Aliki presented documents to Magistrate Judge Garfinkel that it had not produced to Otter Valley. *See id.* Aliki does not dispute either of these contentions.

During the course of this case, the Court held numerous telephonic conferences (far more than in the ordinary case) with the attorneys for the parties in order to resolve discovery disputes. Aliki's non-compliance with the Court's orders began more than a year ago. On June 9, 2009, following a telephonic conference with counsel, and in light of multiple extensions and unexplained delays, the Court ordered Aliki to produce all documents responsive to Otter Valley's document production requests no later than June 15, 2009. *See* Order [doc. # 45]. Between June 9 and June 15, Aliki produced another 703 pages of documents, but it did not produce all of the required documents by June 15; indeed, Aliki was still producing documents three months later.

The Court held another telephonic conference with the parties on August 13, 2009, where Otter Valley again complained that Aliki had not complied with its discovery obligations or the Court's order of June 9, 2009. Following this conference, the Court entered an order expressly authorizing Otter Valley to move for sanctions if it had a good-faith belief that Aliki had violated the Court's prior order. *See* Order dated Aug. 14, 2009 [doc. # 50].

On August 5, 2009, Otter Valley noticed a deposition under Rule 30(b)(6) of the *Federal Rules of Civil Procedure* for the person most knowledgeable about Aliki's records and the damages it is claiming in this lawsuit. *See* Rule 30(b)(6) Dep. Notice [doc. # 64–12]. After being postponed several times, the deposition was scheduled to take place on October 20, 2009. The day before, on October 19, Otter Valley took the deposition (under Rule 30(b)(1)) of Mr. Pappas. *See* Pappas Dep. [doc. # 64–13]. Mr. Pappas testified at this deposition that Aliki kept all of its e-mails, *see id.* at 120:13–21, 132:20–23, but that "there is a large gap of missing e-mails" because the "hard drive failed on [his] laptop and [his computer vendor] did his best to save as much of the information as he could and put it on our server," but "there was quite a bit of information that I lost," *id.* at 256:15, 256:24—257:3. Mr. Pappas also testified that he had created more than 25 pages of handwritten notes beginning when he first heard about the presumptive positive test for Listeria; that he had reviewed these notes between Aliki's first response to the interrogatories and requests for production (dated December 2, 2008) and its second, "substitute" set (dated December 17, 2008); and that, as of the date of the deposition (October 19, 2009), these notes were in the possession of Aliki's attorney. *See id.* at 113:4—114:4. As of that date, however, Aliki had not produced Mr. Pappas's handwritten notes; Aliki has still not done so to this date.

During his October 19 deposition, Mr. Pappas indicated that he would be the Rule 30(b)(6) deponent the following day. When Mr. Pappas was unable to answer several questions that a Rule 30(b)(6) deponent would be expected to answer, Otter Valley became alarmed; its counsel placed its concerns on the record during the October 19 deposition. *See id.* at 273:15—274:6. The parties postponed the Rule 30(b)(6) deposition by another day to per-

mit Mr. Pappas additional time to prepare; nonetheless, he was still unable to testify on several of the topics listed in the Rule 30(b)(6) Notice. *See* Pappas Rule 30(b)(6) Dep. [doc. # 64–17]. Mr. Pappas did clarify during the Rule 30(b)(6) deposition that his hard drive had failed "about four months ago," *id.* at 92:7–9, which, curiously, would have been right around the time of the Court's June 9, 2009 order requiring Aliki to immediately produce the hard drive's contents. *See* Order dated June 9, 2009 [doc. # 45].

Among the emails that Otter Valley says would have been on the failed hard drive were communications demonstrating that Otter Valley gave Aliki proper notice of the possibility that the FACB was tainted and should not be delivered to retail stores, as well as emails refuting Aliki's claims that the subsequent product recall caused it to lose sales. Otter Valley substantiated these claims by producing email communications that it sent Aliki, as well as emails between Aliki and one of its customers, Costco, that Otter Valley obtained by subpoenaing Costco's records.[1] Aliki has never produced the emails between it and Costco.

Because of Aliki's conduct—in particular, the failure to search the hard drive during the nine months between receiving the requests for production and the drive's alleged failure; the failure to produce Mr. Pappas' handwritten notes; and Aliki's failure to produce a deponent prepared to testify on the matters indicated in the Rule 30(b)(6) Notice—Otter Valley moved for sanctions, requesting dismissal of the case. *See* Def.'s Mot. for Sanctions [doc. # 64]. Despite Aliki's evasive and incomplete re-

sponses to Otter Valley's arguments regarding Aliki's willful failures of discovery, the Court declined to dismiss the case at that time. However, in an attempt to mitigate the damage caused by the hard drive's alleged failure, the Court ordered Aliki to produce its computers and hard drives for a forensic examination. *See* Order dated Feb. 12, 2010 [doc. # 90]. In light of the possibility that the hard drive had been intentionally spoliated, the Court's Order added that if the examination revealed "information that Mr. Pappas . . . intentionally destroyed" electronic evidence, "the case would be dismissed and Aliki would be paying legal fees." Tr. of H'ring on Feb. 11, 2010 [doc. # 91] at 33.

The Court also ordered Aliki to pay the first $10,000 of the cost of the forensic examination as a sanction for purposefully withholding documents properly requested by Otter Valley over a year before. However, the Court offered Aliki the opportunity to obtain relief from this financial obligation by demonstrating that it could not afford to pay for the forensic examination, which its counsel claimed was the case. The Court's Order stated as follows:

> As discussed during the hearing on February 11, 2010, Defendant's Motion for Sanctions is GRANTED in part and DENIED in part. The Court declines to dismiss the case at this time, but for the reasons stated on the record on February 11, 2010, the following sanctions are hereby imposed on Plaintiff Aliki Foods, LLC for its failures of discovery and violations of this Court's Order of June 9, 2009:(1) Defendant Otter Valley Foods, Inc. may conduct a forensic ex-

---

1. Aliki had alleged that the recall of the FACB (due to the presumptive positive test for Listeria) had damaged its relationship with Costco, thereby costing Aliki sales. However, the email, from Costco to Aliki, states that the recall should not cause any problems for their ongoing relationship. *See* Email dated Oct.

10, 2007 from Jim Stafford, Costco Vice President for the Northeast Region, to Mr. Pappas, Ex. 15 to Def.'s Mot. for Sanctions [doc. # 64–16] ("We know you value the Costco business and do not anticipate that this have any impact on our relationship going forward.").

amination of the Plaintiff's computers at Plaintiff's expense, not to exceed $10,000; (2) Defendant may petition the Court no later than February 24, 2010 for its reasonable expenses and attorneys' fees related to its efforts after June 15, 2009 to extract documents from the Plaintiff, with the exception of the "pitch" documents, which shall be excluded from the calculations; [2] and (3) Plaintiff's testimony under Rule 30(b)(6) of the *Federal Rules of Civil Procedure* shall be binding on the corporation, and Plaintiff shall not introduce evidence that contradicts its Rule 30(b)(6) witnesses. Should Plaintiff wish to be relieved of the obligation to pay for the forensic examination, it shall file a motion to that effect no later than February 24, 2010, *including with its motion all financial documents necessary for the Court to evaluate its ability to pay.* Defendant's request to extend the discovery period is denied, but without prejudice to renewal should additional evidence be uncovered that warrants an extension. Defendant's request for a spoliation instruction for either the failed hard drive or the handwritten notes is also denied without prejudice to renewal in connection with the parties' Joint Trial Memorandum.

Order dated Feb. 12, 2010 [doc. # 90] (emphasis added).

On or about February 24, 2010, Aliki filed a Motion for Relief of Payment for Forensic Examination [doc. # 95]. In support of its motion, Aliki submitted some financial information, but it was woefully inadequate for the Court to determine whether Aliki could afford to pay for the forensic examination. The adequacies were pointed out by Otter Valley in its Memorandum in Opposition [doc. # 93], but Aliki provided no information to address them in its Reply Memorandum [doc. # 99]. The Court therefore denied Aliki's motion, noting in its ruling as follows:

Now pending is Aliki's Motion for Relief from Payment for Forensic Examination [doc. # 95], which is hereby DENIED. Both during the hearing on the Motion for Sanctions and in its subsequent order, the Court was clear that the burden was on Aliki to substantiate its claim that it could not afford to pay for the forensic examination. This it has not done. While Aliki has submitted some financial information, the Court cannot determine whether it accurately portrays Aliki's ability to pay.

For example, as Otter Valley points out, the financial statements submitted list only "club sales," and yet Aliki apparently has customers that are not warehouse clubs—for example, several professional sports teams. *See* Def.'s Opp'n to Pl.'s Mot. for Relief from Payment [doc. # 93] at 1–2. While Aliki states in reply that "the sales for the various sports teams are actually made" to a distributor, and that Aliki lists these sales as "club sales," Aliki provides nothing beyond its counsel's unsworn statement to substantiate this claim. *See* Pl.'s Reply Mem. [doc. # 99] at 1–2.

Otter Valley has also provided evidence demonstrating that Aliki failed to list at least one of its bank accounts—held jointly with one of its suppliers—in the financial statement submitted to the Court. *See* Def.'s Opp'n to Pl.'s Mot. for

---

**2.** Otter Valley subsequently moved for recovery of its attorneys' fees, *see* Def.'s Pet. for Award of Attorneys' Fees [doc. # 92], but the Court denied this motion, without prejudice to renewal, finding that Otter Valley "larded into its petition hours that [were] not reasonably related to the delays and extra work caused by Aliki's failures of discovery." Order dated Apr. 8, 2010 [doc. # 108]. To date, Otter Valley has not renewed this motion.

Relief from Payment [doc. # 93] at 2. Aliki argues that not only was this omission simply an "oversight," but further that "[t]his is a 'lock box' account which Aliki cannot make withdrawals from and is under the control of [the joint account holder]." See Pl.'s Reply Mem. [doc. # 99] at 2. But here again, Aliki provides absolutely no support for its contention beyond the bare assertions of counsel.

Given the doubts raised by Otter Valley regarding the completeness and veracity of the financial statements provided by Aliki, as well as Aliki's failure to provide any admissible evidence to support its arguments in rebuttal, the Court holds that Aliki has failed to carry its burden of demonstrating that it cannot afford to pay for the forensic examination of its computers—which, in any event, is only necessary because of Aliki's prior misconduct.

Order dated Mar. 26, 2010 [doc. # 101] at 1–3. The Court concluded by stating that its prior order that Aliki pay for the forensic examination of its computers, in an amount not to exceed $10,000, remained in effect as a sanction for Aliki's failures of discovery and its violations of this Court's order dated June 9, 2009. See id. at 3. Aliki was required to provide payment for the forensic examination by April 25, 2010, and the Court stated that "[s]hould Aliki fail to provide the required payment by this date, Otter Valley is authorized to move for the dismissal of this case on that basis." Id.

On April 25, 2010—the day the payment for the forensic examination was due—Aliki filed (without leave of the Court) a second motion requesting to be relieved of the obligation to pay for the forensic examination. See Pl.'s Mot. for Relief from Order [doc. # 109]. Aliki submitted an affidavit from Mr. Pappas dated April 23, 2010, in which he stated that one of its creditors, S & F Foods, Inc. ("S & F"), would be foreclosing on all of Aliki's as-

sets—except Aliki's cause of action against Otter Valley—as of April 27, 2010. See Pappas Aff. [doc. # 109–1]. On that basis, Aliki requested once more that it be relieved of its obligation to pay for the forensic examination of its computers. See Pl.'s Mot. for Relief from Order [doc. # 109] at 1–2.

On April 28, 2010, Otter Valley moved to dismiss this case, not only for Aliki's failure to pay for the forensic examination—and its continued failure to substantiate its claim that it would be unable to pay for it even after the foreclosure—but also for Aliki's failure to preserve the hard drive in question. See Def.'s Mot. to Dismiss [doc. # 111]. Otter Valley enclosed with its motion an email dated March 31, 2010 from Aliki's counsel, which stated that Aliki was unable to "retrieve" the failed hard drive from its computer vendor. See Email dated Mar. 31, 2010 [doc. # 111–1]. Otter Valley also expressed alarm that Aliki was apparently willing to let S & F take possession of the hard drive without any attempt on Aliki's part to preserve it. See Def.'s Mot. to Dismiss [doc. # 111] at 3.

Two days later, on April 30, Aliki filed a Supplemental Motion for Relief [doc. # 112], enclosing with it a copy of the Surrender Agreement between Aliki, Mr. Pappas (as Guarantor) and S & F [doc. # 112–1]. Notably, this Surrender Agreement was entered into just a week prior, on April 23, 2010, two days before Aliki moved to be relieved of its obligation to pay for the forensic examination. Aliki's motion also represented that "S & F Foods will foreclose on Aliki's assets which have already been surrendered pursuant to the Agreement." Pl.'s Supplemental Mot. for Relief [doc. # 112] at 1. Otter Valley responded on May 3 by pointing out that "[a]s with Aliki's other submissions, Aliki's [Supplemental Motion for Relief] does not prove Aliki cannot pay for the

forensic examination of its computers.... At most, Aliki's Motion proves only that Aliki is not paying its bills." Def.'s Resp. to Pl.'s Supplemental Motion for Relief [doc. # 113] at 1. Otter Valley also questioned why Aliki had not submitted the security agreement between it and S & F—which was referenced in the Surrender Agreement as an exhibit thereto—and whether Mr. Pappas had an undisclosed relationship with or ownership interest in S & F. *See id.* at 1–2.

The Court held another on-the-record telephonic conference with the parties on May 4, 2010. Following that conference, the Court gave Aliki yet another opportunity to prove its inability to pay for the forensic examination, entering an order that stated as follows:

As discussed during the on-the-record telephone conference on May 4, 2010, and in order to substantiate its claims of insolvency, Aliki shall file financial statements reflecting both its and Mr. Pappas' assets no later than May 12, 2010. Aliki may file the statements under seal with the Court, and shall send a copy to Defendant's counsel. Otter Valley shall file a supplement to its Motion to Dismiss, including proposed alternatives to dismissal, no later than May 14, 2010. Aliki shall respond to Defendant's supplemental brief no later May 21, 2010.

Order dated May 5, 2010 [doc. # 114].

In response to the Court's order, Aliki filed a one-page unsworn, purported financial statement from Mr. Pappas, but no financial information about Aliki itself other than the hearsay representations of counsel (the Court's order notwithstanding). *See* Pl.'s Second Supplemental Mot. to Vacate Order [doc. # 118]. Aliki also enclosed an email to Aliki's counsel from S & F's attorney, in which the latter stated that S & F was "not interested" in making Aliki's computers and hard drives available for a forensic examination. *See id.,* Ex. B.

In addition to pointing out Aliki's continued failure to provide information *about its* own financial state, Otter Valley responded to Aliki's filings by submitting evidence suggesting that Mr. Pappas' financial statement was materially incomplete. *See* Def.'s Opp'n to Pl.'s Second Supplemental Mot. to Vacate Order [doc. # 123]. In his financial statement, Mr. Pappas claimed that his only asset was a small bank account. *See* Ex. A to Pl.'s Second Supplemental Mot. to Vacate Order [doc. # 118]. However, a search of public records revealed that as of April 30, 2010, Mr. Pappas had a 31–foot, 700 horsepower ocean-going motor yacht registered in his name, *see* Ex. 1 to Def.'s Opp'n to Pl.'s Second Supplemental Mot. to Vacate Order [doc. # 123] at 9–11, and is listed by the Connecticut Secretary of State as the manager of a company bearing his initials—MPI Sales and Marketing, LLC, *see id.,* Ex. 2. While the Secretary of State's webpage does not list the company's owners, MPI's business address is Mr. Pappas' home address. *See id.* Neither the yacht nor MPI were mentioned in Mr. Pappas' financial statement. Otter Valley also questioned one item that *was* on Mr. Pappas' financial statement: the fact that he is now employed as a well-paid consultant by S & F, raising serious questions about the circumstances surrounding Aliki's and Mr. Pappas' decision to hand over the failed (and presumably economically valueless) hard drive to Mr. Pappas' new, Michigan-based employer. *See* Def.'s Opp'n to Pl.'s Second Supplemental Mot. to Vacate Order [doc. # 123] at 3–4. Otter Valley argued that Aliki's submissions only underscored the propriety of dismissing this case with prejudice. *See id.*

Aliki responded to Otter Valley's arguments on May 21, 2010, but only in part. *See* Pl.'s Third Supplemental Mot. to Vacate Order [doc. # 125]. Aliki chose not to address Otter Valley's arguments regard-

ing the veracity of Mr. Pappas' financial statement or to explain his relationship with S & F, but it did enclose an unsworn financial statement of Aliki Foods, dated May 10, 2010 and signed by Mr. Pappas, which listed this lawsuit as Aliki's only asset. *See id.*, Ex. A.

The Court held yet another telephonic conference with the parties on May 25, 2010. During that call, counsel for Aliki represented that the yacht had been owned by Aliki and was seized by S & F as part of the asset foreclosure; and that MPI, Mr. Pappas' other company, was "inactive," and that Mr. Pappas' failure to mention it in his financial statement was merely an oversight. As has typically been the case with Aliki, however, these are merely the unsworn representations of counsel, which Aliki has made no attempt to substantiate with admissible evidence. Aliki's counsel also confirmed that all of the computers that the Court had ordered to be examined more than three months before were in the possession of S & F, and that whatever efforts (if any) Aliki had attempted to regain control of them for the forensic examination (which Otter Valley offered to finance) had been unsuccessful.

To summarize, Otter Valley first requested certain discovery-related materials of Aliki on September 19, 2008. When Aliki stonewalled Otter Valley for several months, the Court ordered, on June 9, 2009, that Aliki search for and produce the discovery-related material no later than the following week. Aliki claims that some of its efforts to comply with this Order were frustrated by the failure of a hard drive, which just happened to coincide with the entry of the Court's June 9, 2009 Order. Therefore, on February 12, 2010, the Court ordered Aliki to produce its computers, including the allegedly-failed hard drive, for a forensic examination, which Aliki was required to finance. The Court gave Aliki the opportunity to prove that it could not afford to pay for the forensic examination, but the Court was clear that even if Aliki could not afford to pay for the examination, Otter Valley was free to do so. Approximately two-and-one-half months later, Aliki and its principal, Mr. Pappas, entered into a Security Agreement with Mr. Pappas' new employer, S & F, whereby Aliki and Mr. Pappas voluntarily turned over to S & F the computers that the Court ordered to be examined, without making any effort whatsoever to have the forensic examination conducted beforehand. Moreover, as detailed above, and despite this Court's clear instructions to the contrary, Aliki has repeatedly chosen to submit highly-suspect documents to the Court (when it has submitted anything at all), relying on the unsworn hearsay statements of counsel to explain away multiple inconsistencies and omissions.

## II.

"[D]iscovery orders are meant to be followed," *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 853 (2d Cir.1995), and "[a] party who flouts such orders does so at his peril," *Update Art, Inc. v. Modiin Publishing, Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988); *see also Agiwal v. Mid Island Mortgage Corp.* 555 F.3d 298, 302 (2d Cir. 2009) (" '[A]ll litigants ... have an obligation to comply with court orders,' and failure to comply may result in sanctions, including dismissal with prejudice.") (quoting *Minotti v. Lensink*, 895 F.2d 100, 103 (2d Cir.1990)). Whether pursuant to Rule 37 of the *Federal Rules of Civil Procedure*, which is the rule invoked in this case, or the Court's inherent power—*see Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) ("It has long been understood that certain implied powers must necessarily result to our Courts of justice from the nature of their institution, powers which cannot be dispensed with in a Court, because they are neces-

sary to the exercise of all others") (internal quotations omitted)—dismissal with prejudice is a sanction of last resort. As the Second Circuit has cautioned, "dismissal with prejudice is a harsh remedy to be used only in extreme situations, and then only when a court finds 'wilfulness, bad faith, or any fault' by the non-compliant litigant." *Agiwal*, 555 F.3d at 302 (quoting *Bobal v. Rensselaer Polytechnic Inst.*, 916 F.2d 759, 764 (2d Cir.1989)); *see also Salahuddin v. Harris*, 782 F.2d 1127, 1132 (2d Cir.1986); *Penthouse Int'l, Ltd. v. Playboy Enters., Inc.*, 663 F.2d 371, 386 (2d Cir. 1981).

In *Agiwal*, the Second Circuit listed a number of factors that bear on the trial court's exercise of discretion to dismiss under Rule 37. These factors include: "(1) the willfulness of the noncompliant party or the reason for non-compliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the noncompliant party has been warned of the consequences of ... noncompliance." *Agiwal*, 555 F.3d at 302 (internal quotations omitted); *see also Bambu Sales*, 58 F.3d at 852–54; *Mills v. City of New Haven*, No. 08cv1046, 2009 WL 3769107, at *7–8 (D.Conn. Nov. 10, 2009); *Nieves v. City of New York*, 208 F.R.D. 531, 535 (S.D.N.Y. 2002). A court weighing sanctions should consider whether the non-compliant party's conduct prejudiced the other side, though a showing of prejudice is not a requirement for dismissal under Rule 37. *See S. New Eng. Tel. Co. v. Global NAPs, Inc.*, 251 F.R.D. 82, 90 (D.Conn.2008); *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emples. & Rest. Emples. Int'l Union*, 212 F.R.D. 178, 229 (S.D.N.Y.2003). Finally, as the court explained in Agiwal, "dismissal pursuant to Rule 37 is appropriate 'not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of

such a sanction.'" *Agiwal*, 555 F.3d at 303 (quoting *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976)). As the district court noted in *Abreu v. City of New York*, 208 F.R.D. 526, 529 (S.D.N.Y. 2002), "an award of sanctions under Rule 37 should effectuate its three purposes: (1) obtaining compliance with discovery orders; (2) ensuring the disobedient party does not benefit from noncompliance; and (3) providing a general deterrent in the particular case and in litigation in general."

### III.

Every factor identified in *Agiwal* favors dismissal of this case as a Rule 37 sanction. *First*, there is no question in the Court's mind that Aliki acted willfully and in bad faith in repeatedly violating its discovery obligations and this Court's orders. Aliki's bad faith is apparent from a number of factors. For one, Aliki has persisted in refusing to produce relevant documents to Otter Valley for nearly two years. A party becomes obligated to preserve evidence when it "has notice that the evidence is relevant to litigation ... [or] should have known that the evidence may be relevant to future litigation." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.1998). Here, there is no question that Aliki was aware of the relevance of its computers and hard drive to this case. In fact, during an on-the-record telephonic conference on October 5, 2009, the Court asked Aliki's counsel whether his client had instituted a litigation hold to ensure that relevant emails were not destroyed. Though he did not say whether a hold was put in place, Aliki's counsel did represent that he had advised his client to do so.

Although Aliki may protest that it cannot be held accountable for the failure of a key hard drive, this comprises only one

part of what the Court has ordered Aliki to produce. Moreover, Aliki certainly *can* be held accountable for not searching the hard drive for the nine months between receiving Otter Valley's request for production and the hard drive's failure, not to mention the failure to produce the hard drive (and its other computers) for the Court-ordered forensic examination and to produce the handwritten notes Mr. Pappas identified in his October 19, 2009 deposition. Additionally, when Aliki has responded to the Court's requests, its answers have been less than candid, and the Court finds that Aliki has been untruthful in certain of its responses, as discussed above. Moreover, the crash of the Aliki hard drive coinciding with this Court's June 9, 2009 order is highly suspect, particularly since: (a) Aliki did not notify the Court or Otter Valley of this circumstance until months later; (b) the Court ordered it to be forensically examined, and warned that if the examination revealed that the drive had been intentionally compromised, this case would be dismissed; and then (c) Aliki took affirmative steps to place the hard drive beyond the reach of the Court without alerting anyone of that impending possibility or making any effort to have the drive examined beforehand.

What is more, Aliki has violated a number of this Court's orders:

- Aliki failed to comply with the Court' June 9, 2009 order compelling it to produce all responsive documents by June 15, 2009.
- Aliki defied the Court's order by agreeing to give its computers to S & F without first searching for responsive documents.
- Aliki defied the Court's order that it pay for the forensic examination of the computers and hard drives. In its order dated March 26, 2010, the Court ordered Aliki to pay for the forensic examination no later than April 25, but

Aliki failed to do so and did not file a second, unauthorized motion to vacate the Court's order until the day payment was due.

- Aliki refused to comply with the Court's various orders that it submit relevant, accurate, and complete financial information in connection with its motions to be relieved of the burden to pay for the forensic examination.

To be clear, the most egregious of these failures is Aliki's and Mr. Pappas' decision, memorialized in the April 23, 2010 Security Agreement, to turn over Aliki's computers (including the failed hard drive) to a third party who happens to now employ Mr. Pappas. Aliki and Mr. Pappas made this decision two and half months *after* the Court ordered those same computers to be forensically examined. Despite the obvious consequences of handing over these computers and hard drive, neither Aliki nor Mr. Pappas made any effort whatsoever to have the computers examined first (for which Otter Valley offered to pay), or even to alert the Court or Otter Valley of the impending possibility that the computers would be given to S & F. Although Aliki argues that it *had* to turn the computers over, the timing and circumstances are highly suspect. *See S. New Eng. Tel. Co.*, 251 F.R.D. at 92–93; *Abreu*, 208 F.R.D. at 531. Moreover, given the May 25, 2010 representation of Aliki's counsel that the computers are currently stored in a warehouse, it is clear that the short period of time necessary to conduct the forensic examination would not have deprived S & F of the use of the computers—which, in any event, are unlikely to have much economic value. In fact, Mr. Pappas testified that the hard drive that contained most of the missing communications had *failed*, making it essentially worthless to anyone *except* Otter Valley, who argues (with evidentiary support) that

the hard drive contained evidence detrimental to Aliki's claims. In short, Aliki intentionally spoliated its own computers and hard drives despite the Court's order to the contrary. *See West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999) (emphasis added) ("Spoliation is the destruction or significant alteration of evidence, or *the failure to preserve property for another's use as evidence* in pending or reasonably foreseeable litigation.") (emphasis added).

In emphasizing the decision of Aliki to give its computers to S & F, the Court in no way suggests that Aliki's other actions were not themselves sanctionable; indeed, "[i]t would be excessively formalistic to view the defiance of [an] order in isolation rather than against the background of [a party's] prolonged and vexations obstruction of discovery with respect to [related matters]." *Penthouse*, 663 F.2d at 388. Rather, it is in view of Aliki's prolonged defiance of its discovery obligations and this Court orders that convinces the Court that this is not a case of "purposeful sluggishness," *see Residential Funding Co. v. DeGeorge Financial Corp.*, 306 F.3d 99, 110 (2d Cir.2002), but rather one of repeated acts of bad faith and willfulness on the part of Aliki, *see S. New Eng. Tel. Co.*, 251 F.R.D. at 92.

Second, the duration of noncompliance is extremely lengthy, as the recapitulation described above demonstrates. Aliki appears to have tried to evade Otter Valley's relevant and appropriate requests for production for as long as possible. Then, approximately a year ago, the Court orders Aliki to produce all of its records, and Aliki does no such thing. At the same time as the Court is trying to find a workable solution to the problem Aliki created, Aliki voluntarily gives its computers and the failed hard drive to a third party. For these reasons, the Court finds as a fact

that Aliki's bad faith conduct has persisted for well over a year.

*Third,* Aliki was repeatedly warned by the Court, and in the strongest terms possible, of the consequences of its behavior. Aliki was warned through its counsel during multiple on-the-record telephonic conferences, see Minute Entries for June 9, 2009 [doc. # 46], Aug. 13, 2009 [doc. # 52], Oct. 5, 2009 [doc. # 56], Dec. 15, 2009 [doc. # 77], May 4, 2010 [doc. # 115]; and May 25, 2010 [doc. # 126]; an in-court hearing on February 11, 2010, see Tr. of H'ring [doc. # 91]; as well as in orders issued by the Court. Indeed, Aliki had numerous opportunities to cure its non-compliance with the Court's orders; to say that the Court has been patient with Aliki is an understatement. There is no doubt that Aliki knew that it risked dismissal of this action and that it pursued its course of action in deliberate defiance of that risk. In sum, Aliki persisted in "sustained and willful intransigence in the face of repeated and explicit warnings from the court that the refusal to comply with court orders . . . would result in the dismissal of [the] action." *Agiwal*, 555 F.3d at 303 (quoting *Valentine v. Museum of Modern Art*, 29 F.3d 47, 50 (2d Cir.1994)) (alterations in original).

*Fourth,* while a finding of prejudice is not necessary for the imposition of sanctions under Rule 37, *see S. New Eng. Tel. Co.*, 251 F.R.D. at 90; *Met. Opera Ass'n, Inc.*, 212 F.R.D. at 229, the Court finds that Otter Valley has been prejudiced by Aliki's conduct. Otter Valley has been prejudiced in two ways. For one, it has had to incur legal fees—which are undoubtedly substantial at this point—for motions for sanctions to try to get Aliki to comply with the Court's orders and its discovery obligations. For another, and more importantly, Otter Valley no longer has access to the "giant swath" of relevant

documents that Mr. Pappas admits Aliki had in its possession. If those documents favored Aliki there would have been no reason not to have produced them to Otter Valley long ago. That Aliki purposely and in bad faith did not produce the documents and then took deliberate steps to spoliate the computers and hard drive strongly suggest that the documents were, in fact, damaging to Aliki's case, which is why they were never produced. *See New Eng. Tel. Co.*, 251 F.R.D. at 92–93 ("[A party] need not prove that the deleted files were material; 'the intentional or grossly negligent destruction of evidence in bad faith can support an inference that the destroyed evidence was harmful to the destroying party.'") (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 110 (2d Cir.2002)). While the Court cannot now obtain compliance by Aliki with the Court's orders regarding the spoliated evidence, the Court can make it clear to these parties and to parties in future litigation that such conduct is not acceptable. *See, e.g., West*, 167 F.3d at 779; *Kronisch*, 150 F.3d at 126.

*Fifth*, the Court must consider alternatives to dismissal and the Court has done so from the very beginning of this odyssey. The Court has considered imposing sanctions against Aliki's attorney, but based on the telephonic conversations and the course of conduct leading up to the spoliation of the computers and hard drive, the Court is convinced that the bad faith was on the part of Aliki and Mr. Pappas, and not Aliki's counsel. The Court also considered monetary sanctions in lieu of dismissal—and, in fact, imposed such sanctions—but Aliki and Mr. Pappas maintain (in highly suspect submissions) that they cannot pay any financial sanctions. Therefore, imposing financial sanctions on Aliki or Mr. Pappas would be a hollow exercise.

Finally, the Court has considered and ordered the parties to brief the issue if alternative sanctions would be appropriate, including deeming certain facts admitted at trial; directing the jury that Aliki could not prove certain aspects of its case; or even providing the jury with an adverse inference charge. *See* Def.'s Supplemental Mot. to Dismiss [doc. # 117]; Pl.'s Obj. to Supplemental Mot. to Dismiss [doc. # 124]. But the Court believes these alternative sanctions would be inadequate, for they would impose on Otter Valley the cost of a trial when Aliki would be highly unlikely to prove its breach of contract or warranty case with certain key facts deemed admitted or uncontestable. That is, deeming the facts relating to Otter Valley's notifications to Aliki regarding the allegedly-tainted product as established in Otter Valley's favor would, in effect, be the same as dismissing the case (or nearly so), although the parties would have to expend further resources on a trial that would be unlikely to change the outcome. *See S. New Eng. Tel. Co.*, 251 F.R.D. at 95 ("While adverse inferences can be effective tools for situations involving the destruction of evidence, in this case the extent of defendants' noncompliance and either willful withholding or destruction is so extensive that any adverse inference sufficient to sanction defendants and address the harm to [plaintiff] would effectively amount to a directed verdict or the equivalent of a default judgment."); *Gutman v. Klein*, No. 03cv1570, 2008 WL 4682208, at *12 (E.D.N.Y. Oct. 15, 2008) ("[L]esser sanctions such as adverse inferences are ill-suited to a case like this, where the spoliator has, in bad faith, irretrievably deleted computer files that likely contained important discovery information.") (citing cases).

Just as important, the Court does not believe that merely deeming certain facts admitted in Otter Valley's favor would be a sufficient sanction for Aliki's flagrant defiance of its discovery obligations and this

Court's orders. First, as discussed above, Otter Valley has argued that Aliki's computers contained emails that would be highly damaging to Aliki's claims; if true—and there is evidentiary support to believe that it is—deeming certain facts admitted would simply put Aliki in the same position that it would have been in had it satisfied its discovery obligations in the first place. Such a result would not compensate Otter Valley for the resources it has expended in wasteful discovery-related motions practice, nor would it serve as a deterrent to either Aliki or other litigants that would countenance similar conduct. *See Abreu,* 208 F.R.D. at 529.

Moreover, it would leave unpunished the tremendous waste of judicial resources occasioned by Aliki's actions. As the Second Circuit warned nearly 30 years ago:

> If parties are allowed to flout their obligations, choosing to wait to make a response until a trial court has lost patience with them, the effect will be to embroil trial judges in day-to-day supervision of discovery, a result directly contrary to the overall scheme of the federal discovery rules.

*Penthouse,* 663 F.2d at 388. The situation here is arguably worse than that foreshadowed in *Penthouse,* as Aliki continues to flout its obligations even as the Court has lost patience. The degree to which this Court has had to supervise Aliki's compliance with its discovery obligations has been significant—not to mention a tremendous waste of resources—and largely for naught, as Aliki intentionally and deliberately destroyed the very evidence that this Court ordered it to produce months ago and that it had an obligation to produce well over a year before.

In light of Aliki's conduct, and despite the Court's view that dismissal is a last resort to be avoided if at all possible, there does not appear to be any alternative to dismissal that would properly punish Aliki for its transgressions; deter others from attempting similar conduct in the future; compensate Otter Valley for the prejudice caused by Aliki; and not impact this Court's ability to administer justice in the other cases before it. *See Nat'l Hockey League,* 427 U.S. at 643, 96 S.Ct. 2778 ("[T]he most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent."); *Jones v. Niagara Frontier Transp. Auth.,* 836 F.2d 731, 735 (2d Cir.1987) ("[I]n this day of burgeoning, costly, and protracted litigation courts should not shrink from imposing harsh sanctions where . . . they are clearly warranted.") (quoting *Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.,* 602 F.2d 1062, 1068 (2d Cir.1979)); *S. New Eng. Tel. Co.,* 251 F.R.D. at 96 (entering default judgment as a sanction for the defendant's willful defiance of court orders and its discovery obligations in order "to prevent defendants' willful noncompliance and destruction [of evidence] from impacting the court's other cases and thus impacting the orderly administration of justice for other litigants.").

## IV.

Accordingly, for the foregoing reasons, the Court GRANTS Otter Valley's motions to dismiss [docs. ## 111, 117] and DENIES Aliki's motions to vacate [docs. ## 112, 118, and 125] the Court's prior orders. **The Clerk is directed to dismiss this case with prejudice and to close the file.**

IT IS SO ORDERED,